FREDERICK C. BAILEY, PLAINTIFF-RESPONDENT, v. ALFRED E. DRISCOLL, GOVERNOR OF THE STATE OF NEW JERSEY, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued September 7, 1955—Decided October 10, 1955.

364

*Mr. David D. Furman,* Deputy Attorney-General, argued the cause for the defendants-appellants other than Charles T. Kline, Jr. (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

*Mr. Vincent A. Grasso* argued the cause for the defendant-appellant Charles T. Kline, Jr. (*Mr. William T. Hiering,* attorney).

*Mr. Chester Mueller* argued the cause for the plaintiff-respondent.

The opinion of the court was delivered by

BURLING, J. This controversy involves the validity of a grant of submerged lands to defendant Kline (hereinafter referred to as Kline) by the Department of Conservation and Economic Development of the State through the Council of the Division of Planning and Development (hereinafter termed "Council").

The action was initiated in the Chancery Division of the Superior Court by plaintiff Frederick C. Bailey (hereinafter called "Bailey") against Kline and numerous state officials, including the Governor, Attorney-General, Commissioners of the Department of Conservation and Economic Development, and the individual members of the Council. Bailey sought invalidation of the grant, injunctive and declaratory relief, all of which was denied and the action dismissed against the state officials. The Appellate Division reversed and remanded, *Bailey v. Driscoll,* 34 *N. J. Super.* 228 (*App. Div.* 1955), ordering substitution of the Council as a party defendant in place of the individually named state officials. Upon defendants' petition, we certified to the Appellate Division. 18 *N. J.* 546 (1955).

The introductory material contained in the opinion of the Appellate Division of which Judge Frederick W. Hall was the author, sets forth in assiduous fashion the intricate factual and procedural background of this controversy. We choose for conservation purposes to incorporate it in this

opinion by reference thereto from page 233 to the end of the continued paragraph at the top of page 243 of 34 *N. J. Super.* The disposition of the adjective questions meets our approval. As to the proper party to represent the State's interest we treat the Council as a party defendant. The substantive questions will be dealt with independently in this opinion.

Our concern is directed to legislation involving submerged lands, *R. S.* 12:3-1 *et seq.*, and the nature of the Council's power as invested by statute to convey such lands. Specifically, did the Legislature impose any limitation on the exercise of that power which would limit the outward extent of a riparian grant to a littoral owner?

 Relatively speaking, there is a paucity of decisions in New Jersey relating to the proprietorship of the State as sovereign in submerged lands. This may be attributed to the fact that certain fundamental concepts appear to be firmly embedded in our law. In *Ross v. Mayor, etc., of Borough of Edgewater,* 115 *N. J. L.* 477, 483 (*Sup. Ct.* 1935), affirmed 116 *N. J. L.* 447 (*E. & A.* 1936), *certiorari* denied 299 *U. S.* 543, 57 *S. Ct.* 37, 81 *L. Ed.* 400, Mr. Justice Heher stated:

"In this state it is settled that the title of the riparian owner extends only to the high-water mark. While a boundary on a non-navigable stream extends *ad medium filum aquae*, in the case of bays, arms of the sea, and navigable rivers, it reaches only to the shore or ordinary high-water mark. This was a principle of the common law. All the land below high-water mark belonged to the British nation, and was vested in the king, as the head thereof, in trust for the public. It was vested by the Revolution in the sovereignty of the state, and is held under the guardianship of the Legislature. *Gough v. Bell,* 21 *N. J. L.* 156; *Same case,* 22 *N. J. L.* 441, 455, affirmed 23 *N. J. L.* 624; *Arnold v. Mundy,* 6 *N. J. L.* 1, 71; *Elizabeth v. Central Railroad Co.,* 53 *N. J. L.* 491; *Stevens v. Paterson and Newark Railroad Co.,* 34 *N. J. L.* 532; *Martin v. Waddell,* 16 *Pet.* 367, 10 *L. Ed.* 997.

There is an essential difference, however, between the public easement in navigable waters and the title of the state to the underlying lands. 'The former inheres in the state in its sovereign capacity. The latter is strictly proprietary.' *Mayor, etc., of Hoboken v. Pennsylvania Railroad Co.,* 124 *U. S.* 656, 8 *S. Ct.* 643, 649, 31

*L. Ed.* 543. It has been held in this state that, while the king at common law, especially after the grant of Magna Charta, was not possessed of the right to divest the people of their common right of navigation and of fishery, in navigable waters, in virtue of his proprietary interest in the soil thereunder, the dominion of parliament over the *jura publica* was absolute and unlimited, and the Legislature is possessed of like omnipotent authority to regulate, abridge, or vacate public rights in navigable rivers, except in the field reserved to Congress by the Federal Constitution. *Stevens v. Paterson & Newark Railroad Co., supra.* The doctrine of this case is that the public has no rights in such waters so fundamental as to be beyond legislative impairment. Be that as it may, the dominion of the state is subject to the paramount power of Congress to control the navigation of such waters to the extent necessary for the regulation of foreign and interstate commerce. *Scott v. Lattig,* 227 *U. S.* 229, 33 *S. Ct.* 242, 57 *L. Ed.* 490; *Mayor, etc., of Hoboken v. Pennsylvania Railroad Co., supra.*"

The historic decisions of the United States Supreme Court popularly known as the "Submerged Land Cases,"—*United States v. California,* 332 *U. S.* 19, 67 *S. Ct.* 1658, 91 *L. Ed.* 1889 (1947); *United States v. Louisiana,* 339 *U. S.* 699, 70 *S. Ct.* 914, 94 *L. Ed.* 1216 (1950); *United States v. Texas,* 339 *U. S.* 707, 70 *S. Ct.* 918, 94 *L. Ed.* 1221 (1950)—recognized paramount right in the Federal Government in lands under the sea. For a treatment of these cases refer to *Bartley, The Tidelands Oil Controversy,* § 1301 *et seq.* (*Univ. of Texas Press,* 1953). Subsequently Congress enacted the Submerged Lands Act, 67 *Stat.* 29 (1953), 43 *U. S. C., sec.* 1301 *et seq.* (*Supp.* 1954), 43 *U. S. C. A.,* which, in effect, quitclaimed any right, title or interest, subject to certain exceptions, which the federal government might have in such lands, to the states, and, as applied to New Jersey, within a boundary of three geographical miles extending seaward from the coastline. Constitutionality upheld, *State of Alabama v. Texas,* 347 *U. S.* 272, 74 *S. Ct.* 481, 98 *L. Ed.* 689 (1954). See *Shalowitz, Boundary Problems Raised by the Submerged Lands Act,* 54 *Col. L. Rev.* 1021 (1954). Thus, for the purposes of this decision the law as pronounced by Mr. Justice Heher in the *Ross* case, *supra,* is applicable.

Having emphasized the absolute proprietorship of the State in submerged lands within its borders, we turn to the

statutory pattern to determine the extent of the power which the Legislature has invested in the Council in making grants or leases of submerged lands. The enactments with which we are primarily concerned appear in chronological order in *Title 12, Chapter 3, Art. 1, sec. 1 et seq.* of the *Revised Statutes.*

▇ Initially, it is to be noted that prior to any comprehensive legislation on the subject, the owner of upland on tidewater was recognized as having a license, arising from local custom, to make improvements within high and low water mark in front of his lands. But this license was merely a privilege and, until exercised, it might be revoked by acts of the sovereign inconsistent therewith. Once exercised it ripened into an indefeasible right of property. *Ross v. Mayor, etc., supra,* 115 *N. J. L.,* at *page* 484. See *Woodcliff Land Imp. Co. v. New Jersey, etc., R. R. Co.,* 82 *N. J. L.* 137 (*Sup. Ct.* 1905). The first significant New Jersey legislation in this field appeared in 1851 with the passage of the "Wharf Act," *L.* 1851, *p.* 335. It gave legislative sanction to the "local custom" previously mentioned. *Stevens v. Paterson & Newark R. R. Co.,* 34 *N. J. L.* 532, 547 (*E. & A.* 1870). It is to be noted, however, that section 2 of the Wharf Act permitted the riparian owner to improve beyond "the limits of ordinary low water," but only upon license obtained for that purpose.

Between 1851 and 1891 the legislative pattern indicates a geographical classification of lands under water and to an extent directs separate treatment be accorded each sphere: first, lands under water of the Hudson River, New York Bay and Kill von Kull; secondly, other such lands in the State; thirdly, lands under water surrounding islands. (See II *Investigation of Riparian Grants, p.* 5 (1907), for a report on riparian grants presented by a legislative committee appointed pursuant to *Joint Resolution No.* 9, *L.* 1906, for a general treatment of this period.) Our concern is directed primarily to the second classification.

▇ In 1864 the Legislature provided for the appointment of a board of commissioners to report on underwater lands within

New York Bay, Hudson River and the Kill von Kull, and certain other specific areas. *L.* 1864, *c.* 391, *p.* 681 (*R. S.* 12:3–1). Thereafter, the Riparian Act of 1869 (*L.* 1869, *c.* 383) was enacted. This appears in the *Revised Statutes* as *R. S.* 12:3–2 to 9. It applies only to lands under tidewater of New York Bay, the Hudson River and Kill von Kull. *Fitzgerald v. Faunce*, 46 *N. J. L.* 536 (*E. & A.* 1884). The act established bulkhead and pier lines upon the subject waters, beyond which it was unlawful to make improvements; the Wharf Act of 1851 was repealed as to New York Bay, the Hudson River and Kill von Kull, and the commissioners, appointed by the Governor, could grant lands under these waters to any persons or corporations. Presumably, the grants could only extend to the bulkhead or pier line. *R. S.* 12:3–7. Although grants were not limited to the "owner of lands, situate along or upon tide waters" as in the Wharf Act, it was necessary for all other parties to first give notice to the owner of the adjoining *ripa* who had a privilege of purchase within a given time. This came to be known as a right of preemption, *American Dock & Improvement Co. v. Trustees, etc.*, 39 *N. J. Eq.* 409, 414 (*Ch.* 1885), and is undoubtedly legislative recognition of the "natural equity" in the riparian owner of which Chief Justice Beasley speaks in *Keyport Steamboat Co. v. Farmers Transportation Co.*, 18 *N. J. Eq.* 511, 516 (*E. & A.* 1866).

The next legislation in point of time is *L.* 1871, *c.* 256, which appears as *R. S.* 12:3–10, as am. *L.* 1938, *c.* 418, and *R. S.* 12:3–11. It authorizes grants of land under water to "any riparian owner on tidewaters in this State," *R. S.* 12:3–10, and the enactment is not to interfere with the prior legislation relating to the waters of New York Bay, the Hudson River or Kill von Kull. *R. S.* 12:3–11. Thus, a second classification is established, and we reach the merits of the problem.

■ The Council based its grant to Kline on the latter's status as a riparian owner of lands fronting on Muskrat Creek, an arm of Barnegat Bay, thus falling within the second classification. Bailey concedes the Council to be the

agency through which the State sells and leases submerged lands, but he disputes that the grant in question was within the Council's power, the issue resolving itself into whether the Legislature imposed any express or inherent restrictions on the exercise of the power which would limit the outward extent of the grant.

*R. S.* 12:3–10 (*L.* 1871, *c.* 256, *sec.* 1) provides in part:

"Any riparian owner on tidewaters in this State who is desirous to obtain a lease, grant or conveyance from the State of New Jersey *of any lands under water in front of his lands,* may apply to the board, which may make such lease, grant or conveyance with due regard to the interests of navigation, upon such compensation therefor, to be paid to the State of New Jersey, as shall be determined by the board, which lease, conveyance or grant shall be executed as directed in sections 12:3–2 to 12:3–9 of this Title, and shall vest all the rights of the State in said lands in said lessee or grantee." (Emphasis supplied.)

The Appellate Division found an implied limitation in the words "in front of his lands," and gained added strength for this proposition from *R. S.* 12:3–23 (which provides for grants to other than riparian owners) which speaks of submerged lands "immediately adjoining the shore." To the court below it seemed beyond question that the Legislature intended some limitation on the outward extent of submerged land grants, and in this we concur. The rule applied by the Appellate Division, however, would limit the outward extent of grant to a mainland owner on an estuary or tributary to the center line of the body of water. In brief, it would invoke analogy to the rule long applied to shore owners on a nontidal river or stream. In this we find error. A review of the legislation pertaining to submerged lands throughout the State leads to the conclusion that riparian grants are to be confined within bulkhead and pier lines, either established or to be established throughout the State.

The Wharf Act of 1851 recognized a right in the shore-owner to improve the area adjoining his lands *to low water mark,* and only upon special license could this be extended. *L.* 1851, *p.* 335. This legislation was in effect throughout

the State (excepting the area of New York Bay, the Hudson River and Kill von Kull) until its repeal in 1891, *L.* 1891, *c.* 124, *p.* 216, *R. S.* 12:3–4, which was subsequent to the act now embodied in *R. S.* 12:3–10 (*L.* 1871, *c.* 256, *p.* 44). Later in 1871 the Legislature passed *L.* 1871, *c.* 605, *R. S.* 12:3–12, which authorized "the board" to grant or lease "land now, * * * under tidewater" and "lands * * * not now, * * * under tidewater" "lying between what was, at any time heretofore, the original high-water line *and the exterior lines established or to be established."* (Emphasis supplied.) The preemptive right of the riparian owner was recognized. Although both submerged lands and lands formerly submerged are included, the preamble indicates the primary purpose of the enactment was to provide a basis for grants of land formerly under tidewater. There would appear to be no rational basis for distinction between the outward extent of grant in the case of land not under tidewater and submerged lands. That portion of *R. S.* 12:3–12 which authorizes grants of *submerged lands* limited in extent to the exterior lines established or to be established, taken in conjunction with *R. S.* 12:3–10, would be meaningless if we interpret the latter section as imposing no limitations, for if no limitation was intended in *R. S.* 12:3–10 (other than interests of navigation) it would accomplish all that *R. S.* 12:3–12 ordains so far as lands under water are concerned. However, if *R. S.* 12:3–12 is read as merely confirmatory of *R. S.* 12:3–10 so far as submerged lands are concerned, then the limitation must be read into the latter section.

But there is other evidence of this legislative intent. *R. S.* 12:3–17 (*L.* 1875, *c.* 308, as am. by *L.* 1888, *c.* 291) directs "the board * * * at the request of shore owners" to extend its surveys over the tidewaters of the state showing what lines have been established for "the exterior lines for solid filling and pier lines." The preamble to *L.* 1875, *c.* 308, lends color to this enactment:

"Whereas, applications are frequently made to the riparian commissioners for grants of lands under tidewater in various parts of

the state, requiring surveys to be made and maps to be prepared and filed with the secretary of state, and some provision should be made to have these surveys extended from time to time as the citizens of the state may require \* \* \*."

The implication that grants of submerged lands are to be affected in some manner by the establishment of exterior lines is compelling. It is to be noted that the term "exterior lines" does not appear in either *L*. 1875, *c*. 308, or in its amendment, *L*. 1888, *c*. 291. Since there are no subsequent amendments, it must be presumed that the *Revision of* 1937 incorporated the term within *R. S*. 12:3–17. There is ample justification for this clarification when it is recalled that by *L*. 1864, *c*. 391, the first board of commissioners was created to make surveys in the lands lying under the waters of New York Bay, the Hudson River, Kill von Kull and other specific areas in the State. *Section* 1 of *L*. 1864, *c*. 391, provided, *inter alia*:

"\* \* \* and to fix and establish an exterior line in the said bays and rivers, beyond which no pier, wharf, bulkhead, erection or permanent obstruction of any kind shall be permitted to be made, and to report to the next legislature, on or before the first day of February next, the result of the information thus obtained, \* \* \*."

The purpose of *L*. 1875, *c*. 308, as reflected in its preamble, was to "extend" these surveys throughout the State.

 What then is the relationship between "exterior lines" and riparian grants? Several of the statutory sections on riparian lands reflect the thought that the very reason for grants of submerged lands is to allow the littoral owner access to navigable waters. For example, *R. S*. 12:3–19 (*L*. 1891, *c*. 5, *sec*. 1), which establishes an island classification of tidewaters, directs "the board" to establish exterior lines around or in front of islands "beyond which no pier, wharf, bulkhead, erection or permanent obstruction" shall be made,

"\* \* \*; provided, however, that no exterior line around or in front of any such island \* \* \* shall be fixed and established *in front of any riparian grant* [made prior to 1891] \* \* \* unless

such exterior line shall be fixed and established * * * at such distance as will * * * leave sufficient waterway in front of said grants for navigation * * *." (Emphasis and explanation supplied)

A rational interpretation of this proviso must construe "riparian grant" as a grant of submerged lands initiating at the mainland, and so construed lends credence to the premise that access to navigable waters is an inherent purpose of riparian grants.

By *L.* 1923, *c.* 154 (*R. S.* 12:3–38 to 44) a procedure for confirmatory action relative to riparian grants or leases made pursuant to any legislative act was established. In determining whether confirmatory action should be given, "the board" is directed to consider whether the grant, taken in conjunction with all other grants in the immediate area, provides "reasonable access to riparian owners to deep water beyond bulkhead and pierhead lines."

One of the major objections raised by the Council in its brief and oral argument to the determination below was that a fixed standard which would limit the outward extent of grant to the middle of a body of water may work injustice to littoral proprietors who might be required to dredge to navigable waters lying beyond the limited area. But if the exterior line itself is established by the Council pursuant to *R. S.* 12:3–17, and as so established it delineates navigable water, the purpose of the grant is fulfilled.

We do not determine the power of *the State* to grant submerged lands unlimited in seaward extent, but only the power of the Council as given it by legislative enactment.

It appears that Kline's grant may be based upon either *R. S.* 12:3–10 or *R. S.* 12:3–12. Under either authority the grant is to be limited in outward extent by the exterior lines established or to be established.

If the exterior line to be established by the Council falls within the two arms of Barnegat Bay between Bailey's island and Kline's mainland so as to intersect the latter's grant, it must be voided to that extent. The preciseness of adjustment, if adjustment is required, is not for the judiciary

to decide. In *In re Plainfield-Union Water Co.*, 11 *N. J.* 382, 396 (1953), we said:

"Where the determination of the operational facts is committed to the expert discretion of the administrative tribunal, the judicial authority cannot substitute its judgment for that of the administrative tribunal."

Whether or not the owner of island *ripa* is to be recognized as having a preemptive right pursuant to *R. S.* 12:3–20 we do not decide. There is no indication that the grant to Kline protruded into lands either above or below water in which Bailey might assert such a right. Any statement to the contrary in the opinion below cannot be considered a binding determination.

Accordingly, the judgment of the Superior Court, Appellate Division, on the substantive issues of this controversy is reversed; the procedural determinations are affirmed. The cause is remanded to the Superior Court, Chancery Division, with directions to order the substitution of the Council of the Division of Planning and Development of the Department of Conservation and Economic Development of the State of New Jersey, replacing the individually named officials of the State of New Jersey, as a party defendant, and entering judgment upholding the validity of the riparian grant to defendant Kline to the extent it is not transgressed by the exterior lines to be established by the Council, and without prejudice to either plaintiff Bailey or defendant Kline to institute proceedings to review the action of the Council which is contemplated by this decision.

No costs will be taxed to any party.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For affirmance*—None.