IN THE MATTER OF THE ENVIRONMENTAL HEARINGS
ON THE PROPOSED SPORTS COMPLEX IN THE HACK-
ENSACK MEADOWLANDS.

Argued December 18, 1972—Decided February 5, 1973.

Mr. *Frederick C. Mezey* argued the cause for appellants New Jersey Citizens for Clean Air, Inc., and others (*Messrs. Mezey & Mezey*, attorneys).

Mr. *Ralph W. Chandless* argued the cause for appellants Township of South Hackensack, Louis Montenegro, Philip Mellilo, Jr. and Board of Education of the Township of South Hackensack (*Messrs. Chandless, Weller & Kramer*, attorneys).

Mr. *James C. Pitney* argued the cause for respondent New Jersey Sports and Exposition Authority (*Messrs. James C. Pitney, John W. Bissell* and *Lawrence B. Litwin*, on the brief; *Messrs. Pitney, Hardin & Kipp*, attorneys).

Mr. *Malcolm S. Zlotkin*, Special Counsel for New Jersey Department of Environmental Protection and Hackensack Meadowlands Development Commission, filed a Statement in Lieu of Brief.

PER CURIAM. This is an appeal, on direct certification by this Court, from a decision of the Department of Environmental Protection and the Hackensack Meadowlands Development Commission, dated October 16, 1972, approving the selection by the New Jersey Sports and Exposition Authority of a site in the Hackensack meadowlands for the establishment of a sports and exposition complex. The decision found that the proposed site was the most suitable location "from an environmental point of view" and that considering all relevant factors, a rational basis existed for its selection.

In *New Jersey Sports & Exposition Authority v. McCrane*, 61 *N. J.* 1 (1972) this Court upheld the constitutionality

of the New Jersey Sports and Exposition Authority Law, *N. J. S. A.* 5:10–1, *et seq.* In substance this law provided for the establishment of a sports and exposition complex in the Hackensack meadowlands and created the Sports and Exposition Authority to carry out the legislative purpose. Our opinion sets forth the broad outlines of the project, the powers conferred and obligations imposed on the Authority, and the means provided for financing the development.

In upholding the constitutionality of the statute we noted that section 23 thereof required the Authority, in undertaking the meadowlands complex, to consult with the Hackensack Meadowlands Development Commission and the Department of Environmental Protection with respect to the ecological factors constituting the environment of the Hackensack meadowlands "to the end that the delicate environmental balance of the Hackensack meadowlands may be maintained and preserved."[1] We held that the informal conferences which the Authority had with the named agencies during its consideration of a site for the complex did not satisfy the purpose of the statute.

It was the unanimous view of all of the members of the Court that the statute imposed an obligation on the Authority:

"to present its proposal for site location to the Meadowlands Commission and the Department of Environmental Protection, and seek their opinion that in using such site the 'delicate environmental balance of the Hackensack meadowlands may be maintained and preserved.' " 61 *N. J.* at 32.

Accordingly, while upholding the constitutionality of the Act, we remanded the matter for a hearing, on notice to the

---

[1] The statute represents a legislative decision that the complex be located in the Hackensack meadowlands. The consultation called for by section 23 is to the end that the site selected by the Authority will be the most suitable from the point of view of maintaining and preserving the delicate environmental balance of the Hackensack meadowlands.

public and the parties to the action, with opportunity for the Authority and all interested parties to present their views on the subject. Any party desiring review of the administrative decision was given leave to apply for direct certification by this Court.

We recognized that the consultation directed by the statute was not itself a quasi-judicial process, but since the end product could then be attacked judicially on an appeal to the Appellate Division, we suggested that the named agencies might well permit the parties to appear before them to make a record which would suffice for the appellate review, thereby obviating the time delay which a two-step affair would entail. The agencies accepted that suggestion and the record made is adequate for judicial review of the quasi-legislative decision of the agencies. On that judicial review, the attacking parties of course have the conventional burden of demonstrating, not that the agencies' action was merely erroneous, but that it was arbitrary.

Pursuant to the remand, the Authority had a study made of the potential environmental impact of the construction and operation of the proposed complex. This study confirmed the selection of the site in question as the best from an environmental standpoint. However, it made numerous recommendations of changes in the project "to minimize the impact of site development and to enhance the environment of the area." The major recommendation made was to revise the Site Plan to preserve and restore approximately 130 acres of tidal marsh in the vicinity of Berry's Creek. These recommendations were accepted by the Authority and a Revised Site Master Plan adopted.

The revised plan, and the study on which it was based, were the subject of the administrative hearing which extended from July 10, 1972 to August 11, 1972.

The decision, while approving the site selection and proposed use from an environmental point of view, imposed additional requirements on the Authority to protect and enhance the environment of the area. These included specific

alternative proposals for the handling of sewage, establishment of a monitoring system to detect air pollution and specific proposals to prevent the possible exceeding of federal air quality standards, and initiation of plans for providing mass transit facilities. While the hearing agencies made no express determination that "the delicate environmental balance of the Hackensack meadowlands," will be maintained and preserved, they did find that the proposed site was the most suitable location "from an environmental point of view."

■■ We have reviewed the comprehensive record made at the remand hearing. We conclude (1) that the kind of hearing we suggested was held, and that all interested parties had a fair opportunity to present their views; (2) that the decision approving the site selection and proposed use from the point of view of maintaining and preserving the delicate environmental balance of the Hackensack meadowlands has not been shown to be arbitrary.

A considerable part of the hearing was concerned with projections of the impact of the complex on air quality from the broad point of view of the public health. While the statutory obligation imposed on the Authority to consult with the named agencies was concerned only with the "delicate environmental balance" of the meadowlands, our remand was sufficiently comprehensive to include the broader issue and the hearing agencies rightly concerned themselves with it.

■ The brief filed by appellants "Citizens for Clean Air" stresses the proposition that the location of the proposed complex in the Hackensack meadowlands is ill-considered and unwise. However, the decision to so locate the complex was made by the Legislature and, as we noted in our original opinion, 61 *N. J.* at 8, this Court cannot concern itself with the wisdom or policy of the legislative action. It is also argued that projections of air pollution emanating from the completed project indicate that standards established under the Federal Clean Air Act (42 *U. S. C. A.* § 1857, *et seq.*) will be violated and will result in a denial of due process

and equal protection, as well as infringe on the implicit constitutional right to a healthful environment. As a corollary, the argument is made that it is beyond the police power of the State to allow the construction of a project demonstrably dangerous to the public health.

These contentions lack validity. It has not been demonstrated that the complex will be dangerous to the public health. Careful consideration was given to the question of air pollution. The record indicated that on-site facility emissions from the complex will be of minor significance on air quality and that the real concern was with motor vehicle emissions. As to this, a comprehensive study was made which included projections and predictions as to air pollution for the year 1990 when a completed project is contemplated. The study indicated that applicable one-hour standards (and their equivalents) will not be exceeded for the three major pollutants on site. The hearing agencies found this study to be substantially unrebutted, the projections and assumptions therein credible, and adopted the same.

Additional evidence was presented as to potential air pollution in 1975 when race track, football field and parking area facilities will have been completed and become operational.

The hearing agencies found that the complex will not interfere with the State of New Jersey achieving the national ambient air quality standards for sulphur dioxide, particulates, and oxidents (since oxident standards will be achieved by 1975 the hydrocarbon standard does not apply). It was also found that under conditions of extreme atmospheric stagnation and high football activity, motor vehicles in the complex could conceivably cause the national standard for carbon monoxide to be exceeded, but not more than once per season. As heretofore noted, the approval given the site and proposed use calls for establishment of a monitoring system to detect air pollution with alternative specifics to achieve and maintain acceptable air quality.

Actually, it is highly speculative to try and estimate air pollution in 1975 when the project will have completed its race track, football stadium and parking area, or in 1990 when the entire complex is scheduled for completion. There are too many variables in the overall picture.

Certainly the Sports Authority will be subject to the Federal Clean Air Act. This act provides for the establishment of national air quality standards through the office of a Federal Administrator, but places the primary responsibility on each state for assuring air quality within its geographical area by requiring it to adopt an implementation plan to attain the standards established by the Federal Administrator. New Jersey has adopted such a plan which has been approved by the Federal Administrator. Attainment of the national standards must be achieved by 1975. The act empowers the Federal Administrator to bring suit directly in the federal court to restrain air pollution in violation of the established standards should any state fail to enforce its implementation plan effectively.

The record indicates that the National Emission Standards Act (42 *U. S. C. A.* § 1857 f–1 to f–8) mandates virtual elimination of emissions of carbon monoxide in all automobiles manufactured during and after model year 1975.[2] The overall result is a joint federal and state attack on air pollution to the end that federal ambient air quality standards will be attained and maintained. In the development and operation of the sports and exposition complex the Authority must conform to these standards.

It is to be noted that the decision of the hearing agencies calls for their continuing participation, primarily in the areas of solid waste disposal and recycling, storm water disposal,

---

[2]The National Environmental Protection Agency has recently issued its regulation requiring oil companies to make one grade of lead-free gasoline generally available throughout the country by July 1974. A second regulation requiring the gradual reduction of the lead content of all other grades of gasoline over a three year period is under study. *The New York Times*, Dec. 28, 1972, at p. 62, col. 1.

sewage disposal, potable water supply, noise abatement and air quality monitoring and control, to the end that the conditions and recommendations set forth in the decision will be effectuated.

The remaining points raised by appellants are basically procedural in nature. We have considered all of them and conclude that the requisites of a fair hearing were satisfied and appellants afforded due process.

Affirmed.

HALL, J., concurs in result.

*For affirmance*—Chief Justice WEINTRAUB, Justices JACOBS and MOUNTAIN, and Judges CONFORD, SULLIVAN and LEWIS—6.

*For reversal*—None.