**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0699-22

IN THE MATTER OF P.T. JIBSAIL
FAMILY LIMITED PARTNERSHIP
TIDELANDS LICENSE NUMBER
1515-06-0012.1 TDI 190001.

_____

Argued April 16, 2024 – Decided May 8, 2024

Before Judges Mayer, Whipple and Augostini.

On appeal from the New Jersey Department of Environmental Protection.

Michael G. Sinkevich argued the cause for appellant Janine Morris Trust (Lieberman Blecher & Sinkevich, PC, attorneys; Michael G. Sinkevich, of counsel and on the briefs; C. Michael Gan and Erica L. Peralta, on the briefs).

Amie C. Kalac argued the cause for respondent P.T. Jibsail Family Limited Partnership (Cullen and Dykman, LLP, attorneys; Neil Yoskin and Amie C. Kalac, of counsel and on the brief).

W. Conor Kennedy, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park,

Assistant Attorney General, of counsel; W. Conor
Kennedy, on the brief).

PER CURIAM

Appellant Janine Morris Trust (JMT)[1] appeals from the October 6, 2022 Final Decision of the Assistant Commissioner of Watershed and Land Management approving action taken by Tidelands Resource Council (TRC or Council), an arm of the New Jersey Department of Environmental Protection (NJDEP), permitting modification of a tidelands license granted to respondent P.T. Jibsail Family Limited Partnership (Jibsail). The tidelands license allowed Jibsail to occupy sufficient tidelands to construct a 168-foot dock extension, resulting in a 300-foot-long dog-legged dock protruding into Barnegat Bay. The final decision under appeal modified a tidelands license issued on March 8, 2018, to allow for a small (1.7-foot) discrepancy between the location of the dock as constructed and the boundaries of the license as initially approved. JMT's appeal asks us to look beyond the modification, however, and argues the TRC's decision to grant the initial license in 2017 exceeded the agency's legislative mandate. Thus, JMT argues both the 2017 license and the 2022 modification should be vacated and remanded for further

---

[1] We refer to the Morris Family and JMT as one for ease of reference.

proceedings consistent with the Council's legislative mandate as stewards of the State's tidelands. We affirm.

I.

"Tidelands" are "all lands under tidewater below high-water mark." In re Tideland's License 96-0114-T, 326 N.J. Super. 209, 212 (App. Div. 1999). The State of New Jersey owns all tidelands in the State's territory and regulates, through the TRC, the issuance of grants and licenses to permit the use of, and building on, such environmentally important lands. Ibid. The Tidelands Act, N.J.S.A. 12:3-1 to 12:3-71, outlines the authority and duties of the TRC.

In 1987 and 1988, JMT's predecessor-in-interest having title to 85 Pershing Boulevard, Lavallette, received a tidelands license from the TRC and a Waterfront Development (WFD) permit from NJDEP to construct a 105-foot-long dock in the tidelands adjacent to their waterfront and to dredge a thirty-foot by ninety-foot area to a depth of four feet below mean low water around the end of their dock. The dock at 85 Pershing Boulevard was constructed accordingly.

In 2006, NJDEP issued a permit to Jibsail's predecessor-in-interest having title to 83 Pershing Boulevard (Jibsail Property), allowing for the

construction of a 128-foot-long dock. This permit required the holder to also acquire a tidelands grant, lease, or license from the TRC to build on the state-owned tidelands, or face fines accruing daily. In 2007, the TRC approved a seven-year license to allow for the construction of the dock at 83 Pershing. This license was assigned to Jibsail on March 22, 2013.

In 2015, the TRC issued a ten-year renewal of the Jibsail tidelands license. Two years later, in 2017, Jibsail applied to NJDEP for a WFD permit and to the TRC for a modification of their tidelands license to allow for the construction of a 185-foot-long dock extension at the end of their extant 128-foot-long dock. At the same time, Jibsail provided written notification to surrounding property owners of their request for the WFD permit. By letters dated March 23 and April 3, 2017, and addressed to NJDEP's Land Use Regulation Program, JMT opposed requests for WFD permits for the construction of three different 300- to 340-foot-long docks at three nearby properties, including the Jibsail Property. According to JMT, these letters were not considered before the permits were approved.

On May 19, 2017, NJDEP issued a WFD permit allowing for the construction of a 167.3-foot-long extension to the dock at the Jibsail Property (Initial Permit) but requiring as conditions precedent that Jibsail obtain a

4

permit from the Department of the Army Corps of Engineers (ACE) and a tidelands license from the TRC for the extended dock. ACE authorized the proposed extension of the Jibsail dock by 168 feet on August 17, 2017, and the TRC issued the tidelands license on March 8, 2018 (Initial License). The dock extension was constructed at the Jibsail Property by May 2018, but it was 1.7 feet out of compliance with the submitted plans and required modifications of the WFD Initial Permit and the TRC Initial License that allowed its construction.

By letters dated May 28 and 29, 2018, and addressed to the Lavallette Planning Board, ACE, and the Bureau of Coastal and Land Use Compliance & Enforcement, JMT complained of the dock extension at the Jibsail Property. By correspondence with NJDEP dated September 11, 2018, JMT continued to object to the dock extension constructed at the Jibsail Property and requested the matter be reviewed for revocation and/or modification of the permit issued to Jibsail.

In March 2019, NJDEP approved the modification of Jibsail's WFD permit to allow for the non-conforming dock (Modified Permit). On April 23, 2019, JMT requested NJDEP hold an adjudicatory hearing to address its appeal of the WFD Modified Permit, which request NJDEP denied.

5

On August 17, 2019, ACE authorized the dock extension as constructed. Jibsail applied to the TRC for modification of the Initial License to align with the Modified Permit. JMT vigorously opposed the application for modification, appearing at the March 4, 2020 Council meeting to argue its case. Requiring further information and briefing from the parties and the State, the Council delayed decision on the matter until the issues had been more fully explored.

On August 26, 2022, JMT filed an Order to Show Cause (OTSC) and Verified Complaint in the Law Division in Ocean County seeking to compel the TRC to issue a decision on the Modified License. Janine Morris Trust v. N.J. Tidelands Council and P.T. Jibsail Family Limited Partnership, No. L-1875-22 (Law Div. filed Aug. 26, 2022). The TRC considered the matter and approved Jibsail's application (Modified License) at a meeting on September 14, 2022. On October 6, 2022, the Assistant Commissioner of Watershed & Land Management approved the TRC's meeting minutes and resolution memorializing Jibsail's license details, thus effectuating Jibsail's Modified License. In this resolution, the TRC made the following findings:

> 1. The Council has determined that the established pierhead line is the outshore extent of an individual riparian owner's riparian rights to erect a dock or pier,

or to claim preemptive rights related to a pending application before the Council.

2. The Council has determined that the Jibsail Modified Tidelands License does not intersect at or inshore of the established pierhead line of any other licensee or grantee in the area.

3. The Council has determined that the Jibsail Modified Tidelands License does not intersect at or inshore of any point within Morris' established pierhead line.

4. The Council has confirmed that the Jibsail Modified Tidelands License had an approved [WFD permit] and an accompanying approved licensed professional survey.

5. In light of the WFD permit issued to Jibsail, the Council has determined that sufficient space was afforded to both the applicant and all permitted and licensed structures in the immediate area.

6. In light of the WFD permit issued to Jibsail, and the comments by the applicant and objector, the Council has determined that sufficient means of navigation was evidenced for both the applicant and the permitted and licensed structures in the immediate area.

7. The Council has determined, in the public interest, that a revocable license, which does not impact the State's title, is the appropriate instrument for the Jibsail Modified License.

8. The Council has given due regard to the interests of navigation for both the applicant and other permitted and licensed structures in the area.

A-0699-22

9. The Council acknowledges that the conditions of the Modified Jibsail Dock Extension were impacted by several factors: the presence of subaquatic vegetation, according to Coastal Zone Management Act provisions, which required Jibsail and other applicants for new licenses in the area to construct longer docks in order to avoid disturbing that protected habitat; the bending shoreline along Pershing Boulevard which limits the apportionable outshore space to construct a dock; and the WFD [p]ermits and Tidelands Licenses associated with 77 and 79 Pershing Boulevard, which were approved prior to the Jibsail WFD [p]ermit and Tidelands License applications, were of similar lengths and angular configurations, and which significantly limited apportionable outshore space for the Jibsail dock.

The OTSC and complaint were withdrawn, and this appeal timely followed.

Our review of an administrative agency's decision is limited. Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103 (1985). We will not reverse the agency's decision unless: "(1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record." Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007).

8

"In reviewing an administrative agency's decision, we will grant considerable deference to the agency's expertise, where such expertise is a relevant factor." In re Petition of S. Jersey Gas Co., 447 N.J. Super. 459, 480 (App. Div. 2016). We "may not second-guess those judgments of an administrative agency which fall squarely within the agency's expertise." In re Stream Encroachment Permit No. 0200-04-0002.1 FHA, 402 N.J. Super. 587, 597 (App. Div. 2008). "Where the determination of the operational facts is committed to the expert discretion of the administrative tribunal, the judicial authority cannot substitute its judgment for that of the administrative tribunal." Bailey v. Driscoll (Bailey II), 19 N.J. 363, 375 (1955) (quoting In re Plainfield-Union Water Co., 11 N.J. 382, 396 (1953)).

"Ordinarily, [NJ]DEP is given great deference when it applies its considerable expertise and experience to the difficult balance between development and conservation." Stream Encroachment Permit, 402 N.J. Super. at 597 (quoting Crema v. N.J. Dep't of Envtl. Prot., 192 N.J. Super. 505, 510 (App. Div. 1984)). "However, '[w]hile [a reviewing court] must defer to the agency's expertise, we need not surrender to it.'" Pinelands Pres. All. v. State, Dep't of Envtl. Prot., 436 N.J. Super. 510, 524 (App. Div. 2014) (quoting N.J. Chapter of Nat. Ass'n of Indus. & Office Parks v. N.J. Dep't of Envtl. Prot.,

241 N.J. Super. 145, 165 (App. Div. 1990)). "The party who challenges [NJ]DEP's decision to permit development of a certain location has the 'burden of demonstrating, not that the agencies' action was merely erroneous, but that it was arbitrary.'" Stream Encroachment Permit, 402 N.J. Super. at 597 (quoting Crema, 192 N.J. Super. at 510 (quoting In re Sports Complex Hackensack Meadowlands, 62 N.J. 248, 252 (1973))).

Furthermore, although we "must give deference to the agency's findings of facts, and some deference to its interpretation of statutes and regulations within its implementing and enforcing responsibility, we are in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Utley v. Bd. of Rev., Dep't of Labor, 194 N.J. 534, 551 (2008) (internal quotation marks omitted).

If an agency's action exceeds the authority granted by "its enabling act or regulations, that act is ultra vires." In re Cert. of Need Appl. for the Mem'l Hosp., 464 N.J. Super. 236, 249-50 (App. Div. 2020). "While findings of ultra vires actions are disfavored, 'our role is to enforce the will of the Legislature because statutes cannot be amended by administrative fiat.'" Id. at 250 (alterations in original omitted) (quoting In re Agric., Aquacultural & Horticultural Water Usage Cert. Rules, 410 N.J. Super. 209, 223 (App. Div.

2009)). Ultra vires acts may be considered either primary or secondary, depending on the extent to which an agency has overstepped.

> There is a distinction between an act utterly beyond the jurisdiction of a municipal corporation and the irregular exercise of a basic power under the legislative grant in matters not in themselves jurisdictional. The former are ultra vires in the primary sense and void; the latter, ultra vires only in a secondary sense[,] which does not preclude ratification or the application of the doctrine of estoppel in the interest of equity and essential justice.
>
> [Middletown Twp. Policemen's Benev. Ass'n Loc. No. 124 v. Twp. of Middletown, 162 N.J. 361, 368 (2000) (quoting Skulski v. Nolan, 68 N.J. 179, 198 (1975)).]

The distinction can also be described by the terms "ultra vires" for the former kind of action and "intra vires" for the latter. Port Liberte II Condo. Ass'n v. New Liberty Residential Urb. Renewal Co., 435 N.J. Super. 51, 65 (App. Div. 2014). "Acts that are ultra vires are void and may not be ratified, while intra vires acts may be." Ibid. (quoting Grimes v. City of E. Orange, 288 N.J. Super. 275, 279 (App. Div. 1996)); see also Bauer v. City of Newark, 7 N.J. 426, 434 (1951). For an intra vires action, "[r]atification must be accomplished 'with the same formalities required for the original exercise of power.'" Port Liberte, 435 N.J. Super. at 66 (quoting Grimes, 288 N.J. Super. at 281).

11

Under that lens, we consider JMT's appeal. Only the October 6, 2022 grant of Jibsail's Modified License may be analyzed under the "arbitrary, capricious, or unreasonable" standard. The TRC's Initial License, issued on December 12, 2017, may be challenged if it was issued ultra vires—beyond the authority of the TRC—or on any of the statutory bases described in the Tidelands Act.

JMT argues the TRC's approval of the Modified License was arbitrary, capricious, and unreasonable because the dock, as approved, is beyond established pierhead lines and is not in the public's interest. JMT additionally argues it was deprived of proper notice, and the dock violates its rights as an upland owner. Alternatively, JMT argues the TRC acted beyond its statutory authority. Having carefully examined these assertions, in light of the record and the standards of review, we reject these arguments.

## II.

"Generally, the State of New Jersey 'owns in fee simple all lands that are flowed by the tide up to the high-water line or mark'[—the tidelands—] . . . and the owner of oceanfront property holds title to the property upland of the high[-]water mark." City of Long Branch v. Jui Yung Liu, 203 N.J. 464, 475-76 (2010) (quoting first O'Neill v. State Highway Dep't, 50 N.J. 307, 323

12

(1967), and citing Borough of Wildwood Crest v. Masciarella, 51 N.J. 352, 357 (1968)). The Tidelands Act includes "provisions of prior enactments extending as far back as 1864, retained in the order in which they were enacted and without the deletion of overlapping or even superseded provisions.[2] This makes the current, applicable law[] difficult to decipher."[3]

In the current form of the Tidelands Act, the Legislature has declared the TRC, created by N.J.S.A. 13:1B-10, "is the public body responsible for the stewardship of the State's riparian[4] lands," or tidelands. N.J.S.A. 12:3-12.1. "[A]ction or inaction [of the Council] . . . in respect of grants of its [tidelands] interests is not reviewable in terms of alleged abuse of discretion but solely on the basis of whether [its] action is within or without the bounds of the pertinent

---

[2] For a comprehensive survey of the history and legislative intent behind the Tidelands Act, see Bailey II, 19 N.J. at 367-74.

[3] N.J. Law Revision Commission, Final Report and Recommendations, Environmental Statutes–Tidelands 2 (April 1998) (citing Att'y Gen. v. Goetchius, 142 N.J. Eq. 636, 640 (Ch. 1948)).

[4] "Riparian" means "[o]f, relating to, or located on the bank of a river or stream." Black's Law Dictionary 1589 (11th ed. 2019). Oceanfront property, on the other hand, is often referred to as "littoral" property. "Littoral" means "[o]f, relating to, or involving the coast or shore of an ocean, sea, or lake." Id. at 1120. Often, in our jurisprudence, the word "riparian" is used broadly to encompass tidally flowed lands, including those flowed by the ocean. Jui Yung Liu, 203 N.J. at 476 n.7; see, e.g., Borough of Wildwood Crest v. Masciarella, 51 N.J. 352, 356 (1968) (citing riparian cases to resolve oceanfront owners' claims).

statutory limitations." In re Tideland's License 96-0114-T, 326 N.J. Super. at 212 (second, third, and fifth alterations in original) (quoting Taylor v. Sullivan, 119 N.J. Super. 426, 430 (App. Div. 1972)). The TRC's authority has been statutorily defined as extending from "the original high-water line [to] the seaward territorial jurisdiction of the State," N.J.S.A. 12:3-12—that is, extending three miles offshore, see 43 U.S.C. §§ 1301(a)(2), 1311(a).

In fulfilling its stewardship duties, the TRC has the authority to make "[a]ny riparian owner on tidewaters in this State" a "lease, grant[,] or conveyance from the State of New Jersey of any lands under water in front of his lands . . . with due regard to the interests of navigation," N.J.S.A. 12:3-10, and if such conveyance is "in the public interest," N.J.S.A. 12:3-12.1. With regard to conveyances that extend the width of the ripa—the border between the upland property (not covered with water) and the tidelands property (covered with water) that is defined by the mean high-water mark—our courts have defined the side borders of tidelands "in front of [a riparian owner's] lands" such that, "where the waterfront is practically straight, the side lines are to run at right angles to it, and if curved, then in such manner as to divide the foreshore ratably among the littoral owners." Bailey v. Driscoll (Bailey I), 34

14

N.J. Super. 228, 255 (App. Div.), aff'd in part, rev'd in part on other grounds, 19 N.J. 363 (1955) (collecting cases).

If a non-riparian owner wishes to receive a lease or grant to use "the lands of the State below mean high-water mark and immediately adjoining the shore," this applicant must provide six months' written notice of intent to the relevant "riparian or shore-owner." N.J.S.A. 12:3-23; see also N.J.S.A. 12:3-7. During this six-month window, the riparian owner of the upland property adjacent to the tidelands at issue may pre-empt the non-riparian owner's application by "apply[ing] for and complet[ing] such lease or grant." Ibid.; see also Bailey I, 34 N.J. Super. at 250 ("This right in a riparian owner to a preference in the acquisition of the lands under tidewater adjoining his upland . . . has come to be called by our courts a 'preemptive right' or 'right of preemption.'").

The TRC, "together with the Commissioner of [NJDEP], may sell or let to any applicant therefor any of the [riparian] lands [around islands, reefs, or shoals that are] under water[,] . . . below mean high-water mark," and within established exterior lines. N.J.S.A. 12:3-20 (emphasis added). Thus, the TRC may be permitted to "sell or let" the "riparian lands around islands, reefs[,] or shoals," to a non-riparian owner without the six-month notice required before

such conveyance of other tidelands in the State. See Bailey I, 34 N.J. Super. at 252-53 ("Conveyances of riparian lands around islands may be made to any applicant; i.e., the riparian owner has no preemptive right . . . ."); but see Bailey II, 19 N.J. at 375 ("Whether or not the owner of island [r]ipa is to be recognized as having a preemptive right pursuant to [N.J.S.A.] 12:3-20, . . . we do not decide.").[5]

The TRC's grant, lease, or license of the State's tidelands only allows for the use of the lands under the tidewater and does not automatically allow construction on those lands. Instead,

> [a]ll plans for the development of any waterfront upon any navigable water or stream of this State or bounding thereon, which is contemplated by any person or municipality, in the nature of individual improvement or development or as a part of a general plan which involves the construction or alteration of a dock, wharf, pier, bulkhead, . . . , or any other similar or dissimilar waterfront development shall be first submitted to [NJDEP]. No such development or improvement shall be commenced or executed without the approval of [NJDEP] first had and received, or as hereinafter in this chapter provided.

---

[5] We do not decide here whether the riparian lands off islands are subject to different statutory treatment than those bordering the mainland. Although the properties at issue are located on West Point Island, which is attached to Lavallette, whether that landmass is considered island or mainland is unclear from the record. The TRC did not make a finding whether the riparian lands at issue here are adjacent to island or mainland.

16

No statute mandates NJDEP approve each and every permit application. NJDEP's permit decisions are based on NJDEP's interpretation of its own rules and regulations.

As required, in 2017—before applying for a modification of the tidelands license issued in 2007 to Jibsail's predecessor-in-title and assigned to Jibsail in 2013—Jibsail received approval from NJDEP and ACE and obtained the appropriate permits for the construction of the dock extension in, on, and above the underwater lands owned by the State. Jibsail's application for the 2017 WFD permit included a Policy Compliance Statement that stated Jibsail's dock met the NJDEP policies promulgated in the Coastal Zone Management Rules, N.J.A.C. 7:7-1.1 to -29.10 (CZM Rules). In that statement, Jibsail's professional engineer asserted, among other things, the navigability of Barnegat Bay and access to adjacent water areas would not be affected by Jibsail's dock.

The record before the TRC reflected that NJDEP Division of Land Use Regulation considered the CZM Rules when it issued the underlying 2017 Initial Permit and the 2019 Modified Permit to Jibsail, finding that Jibsail's dock satisfied the CZM Rules at its current length, location, and configuration.

Among the CZM Rules, the Recreational Docks and Piers Rule, N.J.A.C. 7:7-12.5(b)(9), requires a proposed structure not hinder navigation or access to adjacent moorings, water areas, docks, and piers. The Submerged Vegetation Habitat Rule (SVH Rule), N.J.A.C. 7:7-9.6, requires that a dock located in areas mapped as submerged vegetation habitat—such as Jibsail's dock—be permitted only if "[t]here is no alternative mooring area at the site that would have less impact on the submerged aquatic vegetation." The SVH Rule requires a minimum of four feet of depth at mean low water be present in areas where boats will be moored. N.J.A.C. 7:7-9.6(b)(6)(vi). This requirement means that docks must extend out into the water to at least four feet of depth at mean low water to protect submerged vegetation habitat from boat propellers. See N.J.A.C. 7:7-9.6(e).

In approving the plan prepared by Jibsail's professional engineer in connection with the 2017 Initial Permit and 2019 Modified Permit, the NJDEP Division of Land Use Regulation determined Jibsail's dock substantially complied with the Recreational Docks and Piers Rule and the SVH Rule. For its part, ACE considered navigability as a factor in approving Jibsail's permit modification.

The 2019 Modified Permit included an administrative condition that

18

Jibsail "apply for and receive a tidelands grant, lease or license from the Bureau of Tidelands prior to construction." Accordingly, Jibsail applied for the 2019 Modified Tidelands License. Following permit approval by NJDEP and ACE, the TRC was required to determine whether Jibsail's application for license modification was "in the public interest," N.J.S.A. 12:3-12.1, with "due regard to the interests of navigation," N.J.S.A. 12:3-10.

Notwithstanding the prior approvals from NJDEP and ACE, the TRC examined the alleged impacts of Jibsail's dock on navigability and access to adjacent water areas. JMT and other third parties presented the TRC with extensive testimony, documents, photographs, and arguments regarding Jibsail's dock. In light of that evidence, the TRC found that "sufficient space was afforded to both the applicant and all permitted and licensed structures in the immediate area." The TRC determined, after careful review, that JMT's concerns over the ability to safely navigate to and from its dock were without merit. On the record before us, we discern no basis to conclude the TRC's decision was arbitrary, capricious, or unreasonable.

### III.

The upland properties owned by JMT and Jibsail sit along Barnegat Bay, the entirety of which is considered a tidelands area owned by the State. The

19

State has not issued a riparian grant conveying any part of that area to either JMT or Jibsail; rather, the State has issued tidelands licenses to both. The fundamental differences between tidelands grants and tidelands licenses are key here. First, a tidelands grant "is a conveyance in fee simple of real property," Panetta v. Equity One, Inc., 190 N.J. 307, 309 (2007), while, according to the licenses at issue here, a tidelands license allows the licensee only "to rent an area of land . . . depicted on the [associated] plan." Second, a tidelands grant generally extends the full width of the ripa—that is, the width of the adjacent upland parcel—and out to the pierhead line; a tidelands license grants to the licensee the right to use only the area of tidelands circumscribed by a "license box" on the accompanying survey, an outline that closely approximates the size of the permitted structure—in this case, a dock. These basic differences affect the riparian rights associated with each means of conveyance as well.

"[A] riparian right is a license or privilege to access and make reasonable use of water." Panetta, 190 N.J. at 318. Relatedly, the "riparian-rights doctrine" states that "owners of land bordering on a waterway have equal rights to use the water passing through or by their property." Black's Law Dictionary 1589 (11th ed. 2019). Although the New Jersey Supreme

Court posited in <u>Bailey II</u> that "access to navigable waters is an inherent purpose of riparian[, or tidelands,] grants," 19 N.J. at 374, this proposition does not automatically apply to tidelands licenses as well. A tidelands grant conveys to the riparian owner the right to the land under the water, and our Supreme Court, in deciding the appropriate boundaries of that underwater land, determined that the land should extend far enough out to allow the riparian owner to access navigable water. <u>See</u> <u>ibid.</u> A tidelands license, on the other hand, conveys to the licensee the right to use only the land under the water contained within the limited "license box" on the survey. The licensee's riparian right to use adjacent water, therefore, is no stronger on water outside of the license box than the riparian right of any other member of the public and is likewise subject to the influence of neighboring structures—both above and below the waterline. To the extent JMT argues Jibsail's dock hampers its access to navigable waters, this argument is unavailing, as it is grounded in a tidelands license and not a tidelands grant. Similarly, to the extent JMT asserts its preemptive right to the use of tidelands extends from the bulkhead line to the pierhead line, as if its upland property lines were extended waterward, we likewise disagree with this argument, for similar reasons.

JMT is the fee simple owner of only the upland area, which extends to

the bulkhead line, and the licensee of the tidelands within the license box drawn around its dock. JMT's individual riparian rights, as established by the WFD permit and tidelands license, do not prevent the State from claiming title to and managing the tidelands outside of JMT's licensed area. Jibsail's dock does not intersect with JMT's licensed area. The October 8, 2022 approval of Jibsail's Modified License was not arbitrary, capricious, or unreasonable.

IV.

We similarly reject JMT's assertion the TRC acted beyond its authority fixing pierhead lines. JMT argues the pierhead line was established as required under New Jersey statute, and the Jibsail dock, as permitted, licensed, and constructed, is well beyond the pierhead line. JMT emphasizes the TRC failed to make any findings whether Jibsail's extended dock was located within the pierhead line. JMT asserts documentation in the record shows that Jibsail's dock was constructed beyond the pierhead line, which is beyond the TRC's legislative authority to grant any licenses, leases, or grants.

Here, the TRC acted with clear statutory authority to approve Jibsail's license modification application, and its decision was amply supported by the record. There is no prohibition in the statutes or otherwise that precludes the TRC from doing so, as it is legislatively empowered to manage all the State's

22

tidelands. N.J.S.A. 12:3-12.1; N.J.S.A. 13:1B-13. The TRC's authority

extends to the establishment of exterior lines outside of which no development

can occur. Specifically, the TRC

> shall, from time to time, fix and establish, around or in front of all islands, reefs[,] and shoals situate in the tidal waters of this State, exterior lines in said waters, beyond which no pier, wharf, bulkhead, erection[,] or permanent obstruction of any kind shall be made or maintained, and also the interior lines for solid filling in said waters, beyond which no permanent obstruction shall be made or maintained other than wharves and piers and erections thereon for commercial uses . . . .
>
> [N.J.S.A. 12:3-19.]

The TRC can also establish these lines through individual conveyances.

In Schultz v. Wilson, this court stated:

> We do not consider the Bailey[ II] case as requiring the Council to make an independent survey to establish the pierhead and bulkhead line prior to the execution of a riparian grant. No reason appears why the line cannot be established in the grant itself. It would be unreasonable to assume that in fixing [the riparian owner's] exterior line the Council did not have in mind that in future grants the same exterior course would be followed along the creek, so as to establish a practical uniformity and assure littoral owners reasonable access to navigable waters.
>
> [44 N.J. Super. 591, 607 (App. Div. 1957).]

Here, the TRC found "the established pierhead line is the outshore extent of an individual riparian owner's riparian rights to erect a dock or pier." Just as in Schultz, we find it "unreasonable to assume that in fixing [the riparian owner's] exterior line the Council did not have in mind that in future grants the same exterior course would be followed . . . so as to establish a practical uniformity and assure littoral owners reasonable access to navigable waters." In our view, the TRC's decisions here were within the statute and its established administrative procedures.

Any remaining arguments raised by JMT are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

24 A-0699-22