RICHARD CREMA, DONALD MAXWELL; THE SOUTH JERSEY SHELLFISHERMAN'S ASSOCIATION; THE AMERICAN LITTORAL SOCIETY; AND THE SIERRA CLUB, NEW JERSEY CHAPTER, APPELLANTS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND THE HISTORIC SMITHVILLE DEVELOPMENT COMPANY, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 6, 1983—Decided January 3, 1984.

Before Judges MATTHEWS, MICHELS and KING.

*Nathan M. Edelstein* argued the cause for appellants (*Brener, Wallack & Hill,* attorneys; *Nathan M. Edelstein* of counsel and on the brief).

*Michael J. Gross* argued the cause for respondent Historic Smithville Development Company (*Giordano, Halleran & Crahay,* attorneys; *Michael J. Gross* of counsel and on the brief).

*John M. VanDalen,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Deborah T. Poritz,* Deputy Attorney General, of counsel; *John M. VanDalen* on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

This appeal is a companion case to *Crema v. Environmental Protection Dep't.,* 94 *N.J.* 286 (1983) (Crema I). Appellants are individuals and groups who oppose the plan of the Historic Smithville Development Company (HSDC) to develop a 2,375-acre residential and recreational community in an environmentally sensitive area near Atlantic City, New Jersey.

HSDC proposed a three-phased construction project that would include 6,850 residential units, 310,000 square feet of commercial space, 550,000 square feet of office space, a 700-room hotel, a hospital, a golf course and a school. The site is some 2,000 feet upstream from the Brigantine National Wildlife Refuge, a 20,564-acre preserve dedicated to the protection of wild-

life, birds and saltwater wetlands. The site is part of the aquifer that flows into the Mullica River-Great Bay estuary, one of the last remaining areas in New Jersey where shellfish may be commercially harvested.

Development in the area of the proposed project is regulated by the Department of Environmental Protection (DEP) pursuant to the Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1 *et seq.* (CAFRA). In compliance with that act, HSDC submitted a CAFRA permit application to the DEP's Division of Coastal Resources (DCR) in October 1979. DEP ultimately granted a "conceptual permit" which approved the concept of a development of the type and at the location proposed, but did not give HSDC the right to begin construction until the standards set forth in CAFRA and the regulations promulgated thereunder were met. This conceptual permit was successfully challenged by the individuals and groups who are appellants here. In *Crema I* this court held the conceptual permit to be invalid because: (1) CAFRA does not authorize either explicitly or implicitly the granting of a conceptual permit; (2) the permit granted was devoid of the "carefully documented findings" necessary to justify development in such an environmentally sensitive area, and (3) the reliance upon the large-scale planned residential development rule was misplaced. 182 *N.J.Super.* 445 (App.Div.1982). The Supreme Court, in *Crema I,* while substantially affirming the opinion of the Appellate Division, modified our holding with respect to the authority to issue conceptual approval. Although agreeing that CAFRA contains no express statutory provision for the issuance of a conceptual permit and that likewise the implementing regulations did not authorize such action, the Court concluded that the authority for such conceptual approval could "reasonably be implied" from the statutory scheme. *Crema I, supra* 94 *N.J.* at 303. The Court determined, however, that the power to exercise this implied authority must be established by administrative rulemaking, rather than by adjudication, and on this basis invalidated the conceptual permit. *Ibid.* The alternative holding of the Appel-

late Division, that the lack of essential findings on the issue of secondary impacts foreclosed application of the large-scale planned residential development rule, was affirmed by the Supreme Court. *Id.* at 305–306.

While the appeal in *Crema I* was pending, HSDC submitted a CAFRA permit application for phase 1A of construction. Discussions between the applicant and DCR began in July of 1980. On December 5, 1980, DCR declared the 1A application to be "complete for review," but requested further information on issues of continuing concern. DCR granted the permit on January 27, 1981.[1] During this same period, HSDC submitted an application for a construction permit for phase 1B of the project. After extensive discussion between the applicant and DCR, the 1B permit was issued on November 2, 1981.[2]

Immediately after the Appellate Division's decision in *Crema I,* appellants wrote the Attorney General asking that the DCR issue no further permits and that it rescind the 1A and 1B permits. On January 26, 1982, David Kinsey, the Director of DCR, refused the request, reasoning that the 1A and 1B permits had been independently evaluated and approved by DCR and therefore stood on their own merits unaffected by *Crema I*'s reversal of the conceptual permit. In a letter dated February 2, 1982, appellants strongly disagreed, contending that the 1A and

---

[1]After notice of appeal was filed with the Appellate Division from the decision of the Coastal Area Review Board (CARB) affirming DCR's award of the conceptual permit, appellants moved for a stay of the effectiveness of the phase 1A permit. Although denying the stay, we ordered that:

> The Historic Smithville Development Corporation is expressly cautioned that it proceeds as its own risk. In the event of an adverse determination on the appeal it will not be permitted to assert equities respecting expenses subsequent to this order in connection with the remedy.

[2]During the pendency of this appeal, DCR also granted a permit for phase 1C, the final phase of construction. This administrative action is not challenged in the present appeal. However, counsel informed this court that an initial decision had been rendered in a challenge to the phase 1C permit, which decision is presently before the Commissioner of the DEP.

1B permits failed to meet the requirement of "careful docu-
mented findings" articulated in the *Crema I* opinion, and so
should be reconsidered in light of this standard. The Attorney
General responded simply that he disagreed with appellant's
contentions and did not consider any further response appropri-
ate given the pending petition for certification, but was willing
to meet to discuss the issue. Instead, appellants took their case
to the Director of the Attorney General's Division of Law, who
reasserted the position that the 1A and 1B permits rested on
independent review and analysis and were not dependent on the
conceptual permit.

Appellants subsequently filed a motion with this court seeking
to compel DCR to reconsider permits 1A and 1B. On March 3,
1982, we denied appellant's motion "on the ground that the
subject matter [was] beyond the scope of this appeal." How-
ever, this denial was made without prejudice to appellant's right
to bring a separate appeal from the two permits. A motion for
leave to appeal this order and for an order directing DEP to
reevaluate the 1A and 1B permits was denied by our Supreme
Court on June 16, 1982. Appellants then filed the present
appeal.

In essence, appellants contend that DEP acted arbitrarily and
abused its discretion by refusing to reconsider its grant of the
1A and 1B permits following this court's decision in *Crema I.*
We agree and reverse. Permits 1A and 1B are not conceptual
permits and therefore are not rendered ineffective by the *Crema
I* court's holding that conceptual permits are not authorized by
CAFRA. Nevertheless, they share the stark absence of crucial
factfinding that marred the conceptual permit overturned in
*Crema I.* This flaw is best illustrated by a discussion of the 1A
and 1B permits in the light of DEP's role under CAFRA.

The function of DEP is to "formulate comprehensive policies
for the conservation of the natural resources of the State, the
promotion of environmental protection and the prevention of
pollution of the environment of the State." *N.J.S.A.* 13:1D–9.

In addition, DEP has the power to "[e]nforce the State air pollution, water pollution, conservation, environmental protection, waste and refuse disposal laws, rules and regulations." *N.J.S.A.* 13:1D–9 n.

Ordinarily, DEP is given great deference when it applies its considerable expertise and experience to the difficult balance between development and conservation. The party who challenges DEP's decision to permit development of a certain location has the "burden of demonstrating, not that the agencies' action was merely erroneous, but that it was arbitrary." *In re Sports Complex Hackensack Meadowlands,* 62 *N.J.* 248, 252 (1973), *cert. den. sub nom. New Jersey Citizens for Clean Air Inc. v. New Jersey Sports and Exposition Authority,* 414 *U.S.* 989, 94 *S.Ct.* 291, 38 *L.Ed.2d* 228 (1973). In *Public Interest Research Group v. State,* 152 *N.J.Super.* 191 (App.Div.1977), certif. den. 75 *N.J.* 538 (1977), this court stated with respect to the review of a CAFRA permit:

> In our review of this administrative decision we are necessarily limited to a narrow function, namely, to determine whether there is sufficient evidence in the record as a whole to justify the determination reached below. Such a limited scope of review is particularly significant in this area of highly technical and scientific knowledge, wherein a court must accord a high degree of deference to the administrative agency and its expertise. For an interesting discussion of the judicial role in reviewing environmentally-related administrative decisions see the opinions in *Ethyl Corp. v. Environmental Protection Agcy.,* 176 *U.S.App.D.C.* 373, 541 *F.2d* 1 (D.C.Cir.) (*en banc*), *cert.* den. 426 *U.S.* 941, 96 *S.Ct.* 2662, 49 *L.Ed.2d* 394 (1976). See also, *American Paper Inst. v. Train,* 177 *U.S.App.D.C.* 181, 543 *F.2d* 328, 338 (D.C.Cir.), *cert.* dism. 429 *U.S.* 967, 97 *S.Ct.* 398, 50 *L.Ed.2d* 335 (1976); *Shahmoon Indus., Inc. v. Dept. of Health, N.J.,* 93 *N.J.Super.* 272 (App.Div.1966). And if the record reasonably supports the conclusion below, the court must presume the validity of the analysis made by those having the expertise and training relevant to the subject matter involved. [at 203]

Nevertheless, the courts should ascertain as an initial matter that the agency has acted conscientiously and impartially in exercising its discretion. As was said in *So. Brunswick Tp. v. N.J. Turnpike Auth.,* 129 *N.J.Super.* 126 (App.Div.1974), certif. den. 66 *N.J.* 334 (1974):

> Judicial review of administrative action in this area must be responsive to these criteria. The court should consider, therefore, whether the agency has

conscientiously balanced competing considerations. *Calvert Cliffs' Coord. Com. v. United States A.E. Com'n, supra* 449 *F.2d* [1109] at 1113–1114 (n. 9) and 1115 [ (D.C.Cir.1971) ]. It must also determine whether the administrative evaluation sufficiently accounts for environmental factors. *Environmental Defense Fund, Inc. v. Corps of Eng. U.S. Army, supra* 470 *F.2d* [289] at 300 [ (8th Cir.1972) ]; *cf. Citizens To Preserve Overton Park v. Volpe,* 401 *U.S.* 402, 416, 91 *S.Ct.* 814 [823], 28 *L.Ed.2d* 136 (1971); *Zabel v. Tabb, supra,* 430 *F.2d* [199] at 211 [(5th Cir. 1970) ]. The court, in exercising its function of judicial review, acts as a guardian of the statute to insure that its mandate is fulfilled and that all environmental factors are considered. *Save Our Ten Acres v. Kreger,* 472 *F.2d* 463, 467 (5 Cir.1973). See *Citizens To Preserve Overton Park, Inc. v. Volpe,* 335 *F.Supp.* 873, 876–877 (W.D.Tenn.1972), remanded 357 *F.Supp.* 846 (W.D.Tenn. 1973). *Cf. N.J. Sports & Exposition Authority v. McCrane,* 61 *N.J.* 1, 62–66 (Hall, J., concurring and dissenting in part), *cert.* den. 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.2d* 215 (1972), aff'd 62 *N.J.* 248 (1973); *Texas East. Trans. Corp. v. Wildlife Preserves, Inc.,* 48 *N.J.* 261, 272 (1966), aff'd 49 *N.J.* 403 (1967). [at 136–137]

In the area of CAFRA permits, DEP's discretion is limited by both statute and regulation. "CAFRA represents a legislative effort to balance the need for development of our economy and facilities for human needs with strict control of the degradation of our environment." *Public Interest Research Group v. State, supra,* 152 *N.J.Super.* at 224. The legislative findings enacted as a part of CAFRA, *N.J.S.A.* 13:19–2, provide:

The Legislature finds and declares that New Jersey's bays, harbors, sounds, wetlands, inlets, the tidal portions of fresh, saline or partially saline streams and tributaries and their adjoining upland fastland drainage area nets, channels, estuaries, barrier beaches, near shore waters and intertidal areas together constitute an exceptional, unique, irreplaceable and delicately balanced physical, chemical and biologically acting and interacting natural environmental resource called the coastal area, that certain portions of the coastal area are now suffering serious adverse environmental effects resulting from existing facility activity impacts that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, aesthetic and recreational interests of all people of the State; and that, therefore, it is in the interest of the people of the State that all of the coastal area should be dedicated to those kinds of land uses which promote the public health, safety and welfare, protect public and private property, and are reasonably consistent and compatible with the natural laws governing the physical, chemical and biological environment of the coastal area.

It is further declared that the coastal area and the State will suffer continuing and ever-accelerating serious adverse economic, social and aesthetic effects unless the State assists, in accordance with the provision of this act, in the

assessment of impacts, stemming from the future location and kinds of facilities within the coastal area, on the delicately balanced environment of that area.

The Legislature further recognizes the legitimate economic aspirations of the inhabitants of the coastal area and wishes to encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any facilities in the coastal area.

The guidelines the agency is to use in making the enormously complex and difficult balance envisioned in the legislative findings are established at *N.J.S.A.* 13:19–10.

The commissioner shall review filed applications, including the environmental impact statement and all information presented at public hearings. He shall issue a permit only if he finds that the proposed facility:

a. Conforms with all applicable air, water and radiation emission and effluent standards and all applicable water quality criteria and air quality standards.

b. Prevents air emissions and water effluents in excess of the existing dilution, assimilative, and recovery capacities of the air and water environments at the site and within the surrounding region.

c. Provides for the handling and disposal of litter, trash, and refuse in such a manner as to minimize adverse environmental effects and the threat to the public health, safety, and welfare.

d. Would result in minimal feasible impairment of the regenerative capacity of water aquifers or other ground or surface water supplies.

e. Would cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and within the surrounding region.

f. Is located or constructed so as to neither endanger human life or property nor otherwise impair the public health, safety, and welfare.

g. Would result in minimal practicable degradation of unique or irreplaceable land types, historical or archeological areas, and existing scenic and aesthetic attributes at the site and within the surrounding region.

In 1978, pursuant to the authority delegated to it by *N.J.S.A.* 13:19–17, DEP promulgated an extensive and detailed set of regulations that set forth at length its substantive policies concerning development in coastal areas. *See N.J.A.C.* 7:7E–1.1 *et seq.* The purpose of these rules, as set forth by *N.J.A.C.* 7:7E–1.1(c), is "to increase the predictability of the Department's coastal decision-making by limiting administrative discre-

tion." The regulations "reduce but do not presume to eliminate all conflicts among competing interests." *N.J.A.C.* 7:7E–1.6(b).

*N.J.A.C.* 7:7E–5.3, setting forth coastal growth ratings, breaks down the New Jersey coast into three types of growth areas:

1. Development Region: This region is already largely developed. From a coastwide perspective, development in this region would be infill development. In accordance with the coastal policy on concentration of development, development in this region is preferred over development in other regions, other factors being equal. Infill, extention and some scattered development is acceptable here. Development in these regions, however, must be consistent with Recreation and Public access Policies.

2. Extension Region: This region is the region where development should be channelled after full development of the Development Region. Generally, infill and some extension of development is acceptable here.

3. Limited Growth Region: This region contains large environmentally sensitive areas. Generally, only infill development is acceptable here,[3] with the exception of development which meets the requirements of the Large-Scale Residential Development Policy (*N.J.A.C.* 7:7E–7.2(i)). [*N.J.A.C.* 7:7E–5.3(a) (as amended in 1983)]

Under this scheme, the Mullica-Southern Ocean region is designated a limited growth region. *N.J.A.C.* 7:7E–5.3(h).

A given site's acceptability for development depends on its growth rating, as described above, its environmental sensitivity (defined in *N.J.A.C.* 7:7E–5.4) and its development potential (proximity to roads, central sewerage and existing development, defined in *N.J.A.C.* 7:7E–5.5). For each possible combination of development potential level, environmental sensitivity level, and growth rating, the land acceptability tables, set forth at *N.J.A.C.* 7:7E–5.7, indicate the acceptable intensity of development, be it high, moderate or low. With respect to limited growth areas, *N.J.A.C.* 7:7E–5.7(b)3, as amended in 1983, provides:

The general policy in these areas is that conservation is more important than development and environmental sensitivity is therefore weighed more heavily than in other areas. In the Delaware Bayshore, the concern is the conservation of agricultural land. In the Mullica-Southern Ocean and Great Egg Harbor River Basin regions the concern is conservation of the natural environment. The spread of development must, therefore, be highly restricted.

---

[3]"Infill development" means new development within a partially developed area.

[As to Limited Growth Areas of low or medium environmental sensitivity] moderate intensity development [is] acceptable in sites with high development potential. This allows a limited amount of growth within existing settlements especially where development· had leapfrogged in the past leaving pockets of undeveloped land. Moderate intensity development is also acceptable in large-scale residential developments which meet the requirements of the Large-Scale Residential Development Policy (*N.J.A.C.* 7:7E–7.2(1)).

■ The task of this court is to determine whether DCR "conscientiously balanced competing factors" in granting the 1A and 1B permits according to the standards established by statute and regulation. Such a determination is impossible to make given the sparse and conclusory factfinding embodied in the two permits.

First, DCR has not specified why development of the scope proposed by HSDC should be sited in this environmentally sensitive area rather than elsewhere. Part of DEP's function under CAFRA, as defined by the legislative findings of *N.J.S.A.* 13:19–2 and the "basic coastal policies" set forth in *N.J.A.C.* 7:7E–1.6(b), is to engage in regional planning in an effort to concentrate development and encourage the preservation of open space, with consideration of the region's housing needs. The applicant for a CAFRA permit must describe in his environmental impact statement "[a]lternatives to all or any part of the project with reasons for their acceptability or nonacceptability." *N.J.S.A.* 13:19–7 g. Yet DCR fails to explain in the 1A and 1B permits why it has accepted the Smithville site as being the most appropriate for development. Instead, the two permits state that "the general acceptability of this project was previously determined as a result of the conceptual review of the Towne of Smithville's application. for approval of the overall planned residential development." Such reflexive reliance on the cursory analysis in the conceptual permit is exactly what was feared by this court in *Crema I,* where we observed that:

The fault to be found with the action taken by the agency is that conceptual approval, not being provided for by statute or regulation, is of so indefinite a nature that it is impossible to foretell what inferences may be drawn therefrom when further permit applications are made. As the application gathers momentum through the various stages of approval the likelihood of fresh, vigorous

inquiry by the responsible bureaucracy to assure protection of the environment diminishes and becomes increasingly displaced by reliance upon what one official or another regards as "implicit" in the conceptual approval. Approving, as it does, matters of such pervasive importance as "the type of uses proposed . . . the size of the proposed project in terms of the maximum number of units to be permitted, the maximum square footage of commercial and office space, and the minimum acreage of open space," it may well be later construed to imply at least a partial weighing of statutory criteria, foreclosing thorough inquiry and giving direction to DEP's course of action when later applications are submitted. [182 *N.J.Super.* at 452]

Having chosen to rely on the conceptual permit for their analysis on this issue, DCR has inherited the inadequate fact-finding that characterized that analysis. We hold, as we did in *Crema I,* that this issue has not been addressed adequately by DCR.

The 1A and 1B permits also lack carefully documented findings as to the proposed development's likely effect on the environment. The most significant potential harms to the environment are the increase in runoff water quantity caused by paving over porous soil and the increase in pollutants entering surface water and groundwater from the runoff. Almost no factfinding on these issues can be found in the 1A and 1B permits. The 1B permit reasons simply that "[d]uring the review of the overall conceptual application for the Towne of Smithville, the Division analyzed extensively the impact on water quality of development in this location." Neither permit contains any findings as to the disputed effectiveness of HSDC's proposed "best management practices" program or the ability of the proposed lake system in phase 1B to control runoff quantity and improve surface water quality. Most disturbingly, the two permits contain no detailed findings with regard to the development's potential effects on the Great Bay's shellfish beds. For these reasons, the 1A and 1B permits are inadequate and are of no effect.

Respondents contend that the Smithville project qualifies as a "large-scale residential development" and therefore is exempt from the development restrictions applied to smaller developments. Under DEP's "large-scale residential development" rule,

a freestanding planned development of at least 500 residential units is, in general, exempt from the land-area policies described above (*i.e.,* environmental sensitivity, development potential and growth rating). *N.J.A.C.* 7:7E–7.2(i). Provided the requirements of this rule are met, the 1983 amendments to *N.J.A.C.* 7:7E–5.3(a)3 and *N.J.A.C.* 7:7E–5.7(b)3 make clear that large scale planned residential development of moderate intensity is permitted in the Mullica-Southern Ocean region.

Nevertheless, application of the large-scale planned residential development rule requires that the development "carr[ies] out the basic coastal policy to concentrate the regional pattern of development, contribute[s] to regional housing needs and do[es] not cause significant secondary impacts." *N.J.A.C.* 7:7E–7.2(i); *see Crema I, supra,* 94 *N.J.* at 304–305. The 1A and 1B permits are devoid of the essential findings on these issues, and therefore do not support the application of the large scale residential development rule. On the question of whether the Smithville project will carry out the basic coastal policy to concentrate development, the 1A permit simply relies on the analysis contained in the conceptual permit, which analysis was expressly found to be deficient in *Crema I. See id.* at 305. Permit 1B contains a more detailed analysis, but fails to explain why Smithville is an appropriate location for a new growth center. Moreover, as explained above, both permits are deficient in addressing the secondary effects that likely will be created by development. As was said in *Crema I,* "the absence of essential findings on secondary impacts and the possibility of piecemeal development foreclose application of the [large-scale residential development] regulation." *Id.* at 305–306.

On the basis of the above determinations, we conclude that the refusal of DEP to reconsider the grant of the 1A and 1B permits as requested by appellants after the decision in *Crema I* constituted an abuse of discretion. Accordingly, we reverse and suspend the grant of these permits and remand the matter to DEP for further proceedings not inconsistent with this opinion and the opinion of the Supreme Court in *Crema I.* We direct

that DEP make the specific findings we deem essential to the proper determination of such permit application, based on the present record, as supplemented by such new additional evidence as the commissioner may find necessary and appropriate. We do not retain jurisdiction.