955 A.2d 964 (2008)
402 N.J. Super. 587
In the Matter of STREAM ENCROACHMENT PERMIT, PERMIT NO. 0200-04-0002.1 FHA, Including Stormwater Management Approval; Waterfront Development Permit, Permit No. 0200-04-0002.1 WFD040001 *965 (The "WFD Permit"); Water Quality Certificate (Issued As Part of the WFD Permit); and Coastal Zone Consistency Determination (Also Issued as Part of the WFD Permit) for the Proposed Xanadu Project Issued by the New Jersey Department Of Environmental Protection On October 4, 2004.
In The Matter of the Issuance of a Waterfront Development Permit, Water Quality Certificate, Coastal Zone Consistency Determination and Stream Encroachment Permit by the New Jersey Department of Environmental Protection for the Meadowlands Xanadu Project Permit Nos.: XXXX-XX-XXXX.1 WFD 040001 and XXXX-XX-XXXX.1 FHA 040001.
Nos. A-1435-04T1, A-1438-04T1.
Superior Court of New Jersey, Appellate Division.
Argued January 30, 2008.
Decided September 17, 2008.
*967 Keith E. Lynott, Newark, argued the cause for appellant Hartz Mountain Industries, Inc. in A-1435-04T1 (McCarter & English, attorneys; Mr. Lynott, David C. Apy, Princeton, and J. Forrest Jones, of counsel and on the brief).
Edward Lloyd, New York City, argued the cause for appellants The Sierra Club and others in A-1438-04T1 (Morningside Heights Legal Services, Inc., Environmental Law Clinic, Columbia School of Law, attorneys; Mr. Lloyd, of counsel and on the brief).
Lewin Weyl, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Anne Milgram, Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Mr. Weyl and Dean Jablonski, Deputy Attorney General, on the brief).
Timothy J. O'Neill, Princeton, argued the cause for respondent New Jersey Sports & Exposition Authority (Windels Marx Lane & Mittendorf, attorneys; Mr. O'Neill, of counsel and on the brief; Charles M. Fisher, Ellen M. Christoffersen, and Lisa D. Cornacchia, on the brief).
Michael R. Cole, Teaneck, argued the cause for respondents The Mills Corporation and Mack-Cali Realty Corporation (DeCotiis, FitzPatrick, Cole & Wisler, attorneys; Mr. Cole, of counsel; Benjamin Clarke, Kevin M. Kinsella, and Alice M. Penna, on the brief).
Before Judges WEFING, PARKER and LYONS.
The opinion of the court was delivered by
LYONS, J.A.D.
Sierra Club, New Jersey Public Interest Research Group Citizen Lobby, Inc. *968 and New Jersey Environmental Federation (collectively Sierra) and Hartz Mountain Industries, Inc. (Hartz) appeal from the New Jersey Department of Environmental Protection's (NJDEP) approval of The Mills Corporation and Mack-Cali Realty Corp.'s (Mills) application for various permits sought in connection with the development of the Meadowlands Xanadu project. The project is a mixed use development consisting of entertainment, retail, office, and hotel components and is being constructed surrounding what is now known as the Izod Center and was formerly known as the Continental Airlines Arena site within lands owned by the New Jersey Sports & Exposition Authority (NJSEA).
This is the companion case to In The Matter Of The Proposed Xanadu Redevelopment Project And The Approval Of The Joint Hearing Officers' Report By The New Jersey Meadowlands Commission And The New Jersey Department Of Environmental Protection Pursuant To N.J.S.A. 5:10-23 And Of The Section 5(X) Consultation Report By The New Jersey Meadowlands Commission Pursuant To N.J.S.A. 5:10-5(X) With Respect To The Proposed Project, No. A-0674-04T1 & A-0688-04T1, 402 N.J.Super. 607, 955 A.2d 976, 2008 WL 4223532 (App.Div. 2008), which provides a more detailed factual background of the development. The following factual and procedural history is specifically relevant to our consideration of the issues advanced on this appeal.

I. FACTS AND PROCEDURAL HISTORY

On January 20, 2004, Mills submitted a multi-permit application to the NJDEP for: (1) a waterfront development permit; (2) a water quality certificate; and (3) a coastal zone consistency determination. The application also sought a stream encroachment permit. On February 18, 2004, Mills filed an attachment to the application labeled as "Attachment K" and as an "Alternatives Analysis." On the same date, the NJDEP's Land Use Regulation Program sent a letter to Mills' engineering consultant, outlining certain information that the NJDEP needed before the applications could be deemed administratively complete. Mills submitted a revised version of the Alternatives Analysis on May 7, 2004, to supersede its February 18 submittal. In June and July 2004, Mills agreed to extend the time within which the NJDEP had to review the application due to Mills having filed additional information. That additional information included a June 10, 2004, Stormwater Management Report, and a "Supplement to the Alternatives Analysis" dated July 30, 2004. On August 3, 2004, Mills submitted additional administrative and technical information.
On August 18, 2004, the NJDEP, by letter, advised Mills that the permit application was now complete; that Mills was required to submit additional information to show compliance with the NJDEP's Stormwater Management Rules, N.J.A.C. 7:8-1.1 to -6.3; and that a public hearing was scheduled for September 13, 2004.
On September 13, 2004, in addition to conducting the public hearing, the NJDEP staff issued its preliminary analysis of the application. It concluded that certain additional studies and information were needed to assess compliance with the NJDEP's coastal zone management rules. The analysis also noted that, while this application process was ongoing, a separate consultation process with public hearings conducted by the New Jersey Meadowlands Commission (NJMC) and the NJDEP, was occurring, pursuant to N.J.S.A. 5:10-23. The analysis further noted that the hearing officers in that matter had issued a report on August 19, 2004, *969 and that report, together with its recommendations and requirements, were included in the analysis where appropriate. At the hearing, both Sierra and Hartz representatives appeared and testified, among others. At the conclusion of the hearing, the parties were advised that the record would remain open for fifteen days so that written comments could be submitted to the NJDEP.
During the post-hearing comment period, Mills provided the NJDEP with additional items: information regarding its transfer of the Empire Tract and its wetlands mitigation plans; its stormwater management plans; drawings for a parking deck that it previously had submitted to the Department of Community Affairs; and comments on the NJDEP's preliminary analysis. Comments were also filed by Hartz and Sierra.
On October 4, 2004, the NJDEP conditionally approved the application for the NJDEP permits. On that same day, the NJDEP also issued a "summary analysis" explaining its reasoning for approval. Also on that same day, the NJDEP granted Mills a stream encroachment permit. The approval permits were subject to eight general conditions and twenty-six special conditions, which included issues related to traffic and transportation; air quality; stormwater; and wetlands impacts. These appeals ensued.
In October 2004, the Borough of Carlstadt, which has not filed an appeal in this matter, requested a third-party hearing before the NJDEP. On January 12, 2006, the NJDEP denied that request, but in discussing the merits of the Borough's arguments, the NJDEP made some additional findings concerning wetlands, stormwater management, traffic, air quality, and other permitting issues.
Hartz and Sierra also filed appeals in federal court, challenging a freshwater wetlands permit issued in March 2005 by the Army Corps of Engineers. This permit allowed Mills to fill approximately 7.69 acres of wetlands for the Xanadu project. Hartz's federal appeal was dismissed for lack of standing, and on September 28, 2006, the Sierra appeal was dismissed on the merits. Sierra Club v. U.S. Army Corps of Eng'rs, 450 F.Supp.2d 503 (D.N.J.2006).[1]

II. POINTS ON APPEAL

On appeal, Sierra and Hartz argue that deference need not be accorded the factual and legal findings of the NJDEP. They argue that: there was an insufficient factual *970 basis for the NJDEP to grant the permits in the first instance; the necessary findings were not made by NJDEP; and the NJDEP impermissibly issued conditional permits. They also argue that the issuance of the permits is without legal basis, particularly asserting that the permits violate N.J.A.C. 7:7E-3.27(c)(1). That regulation prohibits developments in wetland areas unless certain conditions are met. Lastly, the parties argue that the conditions imposed on the permits give rise to Mills being required to file additional submissions in the future and that they and the public will not be effectively permitted to comment on such later filed submissions.
The NJDEP, on the other hand, argues that its decision is entitled to substantial deference; that there is substantial credible evidence in the record to affirm the issuance of the permits; and that the decision to allow the filling of the wetlands was proper because the Army Corps of Engineers granted a permit which renders moot the NJDEP permitting issue and appropriate regulations were complied with. Mills also argues that the NJDEP's decision is entitled to judicial deference; that there is no prohibition to the conditions that were issued in conjunction with the permits; and that the regulations were applied appropriately. NJSEA advances substantially the same arguments.

III. LEGAL DISCUSSION

We begin by outlining some basic legal principles. The NJDEP is authorized to "formulate comprehensive policies for the conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State." N.J.S.A. 13:1D-9. Among numerous other powers, the NJDEP has the power to "[e]nforce the State air pollution, water pollution, conservation, environmental protection, waste and refuse disposal laws, rules and regulations." N.J.S.A. 13:1D-9(n).
"A strong presumption of reasonableness accompanies an administrative agency's exercise of statutorily-delegated responsibility." Gloucester County Welfare Bd. v. State Civil Serv. Comm'n, 93 N.J. 384, 390, 461 A.2d 575 (1983). "[T]he burden of proving unreasonableness falls upon those who challenge the validity of the action." Smith v. Ricci, 89 N.J. 514, 525, 446 A.2d 501, appeal dismissed, 459 U.S. 962, 103 S.Ct. 286, 74 L.Ed.2d 272 (1982). In determining whether an administrative act enjoys statutory authorization, the reviewing court may look beyond the enabling act's specific terms "to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." Dep't of Labor v. Titan Constr. Co., 102 N.J. 1, 10-11, 504 A.2d 7 (1985).
We may not second-guess those judgments of an administrative agency which fall squarely within the agency's expertise. Further, we will only reverse a decision of an administrative agency if it is arbitrary, capricious, or unreasonable. Brady v. Bd. of Review, 152 N.J. 197, 210, 704 A.2d 547 (1997). Courts generally defer to an agency's expertise on technical matters within the agency's field of expertise. Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 588, 781 A.2d 1035 (2001). "Thus, if substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513, 606 A.2d 336 (1992). "Agencies, however, have no superior ability to resolve purely legal questions, and that a court is not bound by an agency's determination of a legal issue is well established." Ibid.

*971 Ordinarily, DEP is given great deference when it applies its considerable expertise and experience to the difficult balance between development and conservation. The party who challenges DEP's decision to permit development of a certain location has the "burden of demonstrating, not that the agencies' action was merely erroneous, but that it was arbitrary."
[Crema v. N.J. Dep't of Envtl. Prot., 192 N.J.Super. 505, 510, 471 A.2d 422 (App. Div.) ("Crema II") (quoting In re Sports Complex Hackensack Meadowlands, 62 N.J. 248, 252, 300 A.2d 337, cert. denied, 414 U.S. 989, 94 S.Ct. 291, 38 L.Ed.2d 228 (1973)), certif. denied, 96 N.J. 306-07, 475 A.2d 597 (1984).]
As our Supreme Court stated in New Jersey Guild of Hearing Aid Dispensers v. Long:
[a]nother basic tenet of judicial review is that the courts are not free to substitute their judgment as to the wisdom of a particular administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because [it is] arbitrary or unreasonable: "if there is any fair argument in support of the course taken [by the agency] or any reasonable grounds for difference of opinion among intelligent and conscientious officials, the decision is conclusively legislative and will not be disturbed unless patently corrupt, arbitrary or illegal. Doubts held by the courts as to the wisdom of the administrator's decision do not alter the case. . . ."
[75 N.J. 544, 562-63, 384 A.2d 795 (1978) (quoting Flanagan v. Civil Serv. Dep't, 29 N.J. 1, 12, 148 A.2d 14 (1959)).]

A. Factual Basis to Grant Permits

We now turn to the argument that there was an insufficient factual basis to grant the permits. We note that there were numerous materials submitted to the NJDEP for its consideration in processing this application. Mills submitted not only its original application, but numerous supplemental submissions. There was a public hearing and comments were received in connection therewith, both orally and in writing. In its February 18, 2004, letter, the NJDEP requested Mills to supplement its application concerning eighteen specific issues. The NJDEP requested a copy of Mills' traffic analysis submitted to the DOT, as well as a site remediation plan to address any contaminated areas on the project site. In addition, the materials submitted by Mills to the NJDEP as part of the NJDEP's consultation responsibility under N.J.S.A. 5:10-5(x) and 5:10-23 were also utilized and available to the NJDEP, including a 2500 page environmental impact statement. Also available to the NJDEP was the NJMC's and NJDEP's joint hearing officers' report concerning the environmental aspects of the Xanadu project completed pursuant to N.J.S.A. 5:10-23.[2] Many of the topics addressed in that report overlap with the requirements of this application. In sum, we are satisfied, after an extensive review of the record, that there were sufficient factual proffers made to the NJDEP in order for it to review and grant the permits.

B. Required Factual Findings

The next issue raised by Sierra and Hartz is that while there may be numerous facts in the record, the NJDEP failed to make the necessary factual findings to issue the permits. We have considered the October 4, 2004, summary analysis *972 of the NJDEP. It reviews each of the standards detailed in the rules concerning coastal zone management and makes appropriate findings for each appropriate regulation.
With respect to the requirements dealing with traffic, the NJDEP recognized that it would be difficult to assess all potential future traffic impacts at this time given the phased nature of the project. Thus, it established a two-part approach noting that it was relying on the DOT to review large projects such as this. Further, the NJDEP, after it had reviewed the traffic impact study submitted to it, established certain conditions to be met in light of present conditions and then it imposed conditions for permits to address traffic impacts that may arise in the future as various phases of the project were completed.
This approach is certainly debatable, but given our scope of review as outlined above, we find that it does not constitute an arbitrary or capricious resolution of the problem. While we do not necessarily endorse the wisdom of the approach, we do accord significant deference to the expertise of the NJDEP and do not find that the conclusion warrants reversal.
With respect to air quality issues, the same analysis applies. The NJDEP recognized that Xanadu is a phased project and that mitigation may have to be addressed as its various phases develop. Since all of the phases may never be completed, the NJDEP's approach appears reasonable, given the conditions imposed.
With respect to mass transit issues, we note that the NJDEP addressed that by requiring Mills to cooperate and coordinate with the DOT and NJSEA to implement a plan of action for regional transportation improvements. In sum, we find sufficient factual basis to support the determinations of the NJDEP.

C. Permit Conditions

Sierra and Hartz also argue that certain of the approvals constitute impermissible conditional approvals. The parties cite Crema v. N.J. Dep't of Envtl. Prot., 94 N.J. 286, 463 A.2d 910 (1983) ("Crema I"), and Crema II, supra, 192 N.J.Super. 505, 471 A.2d 422, regarding the limits of an agency's authority to issue conditional permits. That litigation involved a development sought in an environmentally sensitive area governed by the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19, and associated regulations. The NJDEP granted a permit approving only the "concept" of the development, without authorizing any construction until all statutory and regulatory standards were met. Crema I, supra, 94 N.J. at 289, 463 A.2d 910. We and the Supreme Court both found that the NJDEP had not issued a "conditional permit" of the type which was authorized by the regulations. Id. at 296-97, 463 A.2d 910. The Court in Crema I, though, agreed with our decision in Public Interest Research Group v. State, 152 N.J.Super. 191, 377 A.2d 915 (App.Div.), certif. denied, 75 N.J. 538, 384 A.2d 517 (1977). In Public Interest Research, because we found that the statutory criteria for the construction at issue in that case was "basically satisfied," a conditional permit was appropriate, as opposed to the Crema I facts in which the permit purported to postpone until a later date the applicant's satisfaction of the statutorily required findings. Crema I, supra, 94 N.J. at 297, 463 A.2d 910. The Court in Crema I found no explicit authority for a conceptual approval permit in the CAFRA statutes or regulations. Id. at 298, 463 A.2d 910. The Court held, however, that the conceptual approval approach was impliedly authorized under CAFRA, but to implement a "conceptual approval" process *973 under CAFRA, the NJDEP needed to adopt "regulatory standards, both substantive and procedural." Id. at 303, 463 A.2d 910.
The Crema II decision pointed to by the appellants dealt with construction permits issued by the NJDEP while the Crema I appeals were pending. Crema II, supra, 192 N.J.Super. at 508, 471 A.2d 422. The issuance of these permits was also reversed by us, because they "share the stark absence of crucial factfinding that marred the conceptual permit overturned in Crema I." Id. at 509, 471 A.2d 422.
We find that the regulations at issue here do allow conditions to be placed on approvals. See, e.g., N.J.A.C. 7:7-1.4. We also find after reviewing the NJDEP Summary Analysis accompanying the permits that the NJDEP had before it sufficient facts to support the necessary findings to issue conditional permits. See Crema I, supra, 94 N.J. at 297, 463 A.2d 910. We follow the analysis in Public Interest Research Group v. State, supra, 152 N.J.Super. at 211, 377 A.2d 915, which established that in those cases where the nature of the subject matter involves a highly complex project for which there will be a necessary evolution, that provisional treatment is appropriate. Here, it is not yet clear what will comprise the final Xanadu project. Many of the discussed components are subject to market and economic conditions. They may never be developed. Accordingly, giving great deference to the agency's expertise, we do not find the conditional approach in this case to be impermissible.

D. Development of the Wetlands

Lastly, the parties argue that the filling in and development of the wetlands is prohibited under N.J.A.C. 7:7E-3.27(c). Sierra now argues for the first time that the development was prohibited under N.J.A.C. 7:7E-3.27(c)(1). We note at the outset, after a careful examination on the record, that nowhere did either Hartz or Sierra specifically raise this argument below. Hartz mentioned N.J.A.C. 7:7E-3.27(c)(2), but never mentioned the first subsection which is set forth in the parties' briefs. Both Hartz and Sierra made reference to N.J.A.C. 7:7E-4.10(d), the filling rule, below. Both entities argued that the use by Mills for the property was not water dependent.
Normally, we do not consider issues not raised below at an administrative hearing. Bryan v. Dep't of Corr., 258 N.J.Super. 546, 548, 610 A.2d 889 (App. Div.1992) (citing Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973)). Our Supreme Court has said in Abbott v. Burke, 119 N.J. 287, 390, 575 A.2d 359 (1990), that where a claim "was not included in the original pleadings or in the prehearing order setting forth the issues. . . [and] was apparently never explicitly advanced as a claim until the hearing had concluded," that the issue was not fully litigated and that under those circumstances, it would not rule on the matter. Consequently, it would be appropriate for us not to review the issue.
In reviewing the issue raised, however, it becomes clear that it is one of public importance and will likely arise in the future. Accordingly, we will address it.
Any violation of N.J.A.C. 7:7E-3.27(c)(1) would turn on whether the areas to be filled were "waterways" within the meaning of the regulation. N.J.A.C. 7:7E-3.27(c)(1) states:
(c) Development of all kinds in all other wetlands not defined in (b) above is prohibited unless the Department can find that the proposed development meets the following four conditions:

*974 1. Requires water access or is water oriented as a central purpose of the basic function of the activity (this rule applies only to development proposed on or adjacent to waterways). This means that the use must be water dependent as defined in N.J.A.C. 7:7E-1.8. . . .
[N.J.A.C. 7:7E-3.27(c)(1) (emphasis added).]
We note that in the permit application, Mills specifically made reference to N.J.A.C. 7:7E-3.27(c) and pointed out that,
the first condition requires that the project must require water access or be water oriented as a central purpose of the basic function of the activity. This rule only applies to the development proposed on or adjacent to waterways. The Meadowlands Xanadu Project is not proposed immediately adjacent to the Hackensack River and, thus, this condition is not applicable.
While all parties agree that the project is not water dependent, they do not agree whether the wetland areas to be filled constitute waterways.
The regulation at issue specifically provides that the rule only applies to development proposed on or adjacent to "waterways." The regulations, however, do not provide us with a definition of the word "waterways." Nor is there a commonly accepted definition of the word. Webster's New World College Dictionary (4th ed. 2001) defines waterways as a "channel or a runnel through or along which water runs" as well as "any body of water wide enough and deep enough for boats, ships, etc. as a stream, canal, or river; water route." As mentioned above, the assertion by Mills in its application that it was not on a waterway was not argued or contested by any of the parties below.
The Army Corps of Engineers described the area at issue as follows:
The original Cedar Creek was filled over 30 years ago and a channelized streambed/culvert system was constructed along the outer perimeter of the peripheral road on the Arena site during the original construction of the Sports Complex. The drainage ditch constructed in the 1970s was built by excavating through soils that are considered "Historic Fill." As a result, groundwater leaches from the historic fill into the Creek, which acts as a pathway to convey contaminants into the Cedar Creek and the Hackensack River. It should also be noted that sediment sampling in the Creek revealed that the bed sediments are contaminated above the NJDEP Estuarine Sediment Guidelines. NJDEP finds that filling of the Creek and wetlands would provide a continuous cap over the historic fill present on the Site and prevent the release of contaminated sediments into the aquatic ecosystem.
Absent a consensus definition, it is appropriate to utilize the interpretive maxim "noscitur a sociis," the meaning of a word or a particular set of words in a statute may be indicated, controlled, or made clear by the words with which it is associated. Falcone v. Branker, 135 N.J.Super. 137, 146-47, 342 A.2d 875 (Law Div.1975). It is necessary then to look at the regulation as a whole; it deals with the development of wetlands. First of all, the rule defines "wetlands" as an "area that is inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of vegetation commonly adapted for life in saturated soil conditions, commonly known as hydrophytic vegetation." N.J.A.C. 7:7E-3.27(a). Consequently, since the regulation deals with developing wetlands, the phrase "waterway" must mean more than wetlands which is specifically *975 defined. The rules further provide that a water dependent development requires direct water access. N.J.A.C. 7:7E-1.8. The definition of water dependent requires one to consider not only the need for the proposed use for access to the water, but also "the capacity of the proposed water body to satisfy the requirements and absorb the impacts of the proposed use." Ibid.
In order then for the definition of waterway in N.J.A.C. 3.27 to make sense, the development must not only be one which requires water access, but the body of water would have to be consistent with the intended use. In looking at this project and this site, based on the record before us, there is little, if any, possible water dependent use for this property, because it lacks any body of water which could satisfy a requirement of any proposed water dependent use.
Consequently, the area to be filled in this case could not be a waterway within the meaning of the regulation as it could not support any water dependent use, but it merely constitutes wetlands, part of which contain a small narrow culvert. Accordingly, we find that the area to be filled is not a "waterway" and the N.J.A.C. 7:7E-3.27(c)(1) requirement is not applicable.
With respect to the other requirements of N.J.A.C. 7:7E-3.27, we are satisfied that there is sufficient credible evidence in the record to support the NJDEP's findings that there is no prudent or feasible alternative to developing the project on a non-wetlands site. The site here is limited to the Arena area. The only alternative is to drastically cut back the project, which the NJDEP has concluded is not prudent or feasible. We again do not impose our judgment, but given our scope of review, rely upon the expertise of the NJDEP in this regard. The same analysis would apply for the third prong and fourth prong of the regulation. Consequently, we do not find there to be a violation of N.J.A.C. 7:7E-3.27(c).
The permit is also in compliance with N.J.A.C. 7:7E-4.10(d). With respect to N.J.A.C. 7:7E-4.10(d), we note that it reads in pertinent part that, "[e]xcept as provided in (b) and (c) above, filling is discouraged in all other water areas. In cases where there is no alternative to filling, filling is conditionally acceptable provided" certain restrictions, such as being a water-dependant use, are met. N.J.A.C. 7:7E-4.10(d) (emphasis added). While this project is not a water dependent use, the rule does not prohibit development and filling, rather it is "discouraged." "Discouraged" is a defined term; it means that:
a proposed use of coastal resources is likely to be rejected or denied as the Department has determined that such uses of coastal resources should be deterred. In cases where the Department considers the proposed use to be in the public interest despite its discouraged status, the Department may permit the use provided that mitigating or compensating measures can be taken so that there is a net gain in quality and quantity of the coastal resource of concern.
[N.J.A.C. 7:7E-1.8.]
It is evident to us that NJDEP found the project to be in the public interest. The N.J.S.A. 5:10-23 report relied on by NJDEP noted the socioeconomic "beneficial impacts [of the project] to the municipality, region, and overall State of New Jersey." Moreover, the NJDEP Summary Analysis, in great detail, outlined a significant environmental mitigation program including the dedication of the Empire Tract, which is of considerable benefit *976 to the public.[3] By permitting the filling to continue, especially in light of the preservation of the Empire Tract and the Secaucus High School site, NJDEP clearly understood its actions to serve the public interest.
We are satisfied, therefore, that the NJDEP, after reviewing the mitigation plan, including especially the transfer of the Empire Tract, and the nature and scope of the project, had substantial credible evidence to exercise its discretion to permit this development.
Bound by the standard of review, we defer, therefore, to the NJDEP, which possesses significant technical expertise in these matters. Campbell, supra, 169 N.J. at 588, 781 A.2d 1035. We find that NJDEP's conclusion that the filling in of less than eight acres of wetlands, when contrasted with the 587-acre Empire Tract dedication, results in "a net gain in quality and quantity of the coastal resource of concern," and is not arbitrary, capricious, or unreasonable. Brady, supra, 152 N.J. at 210, 704 A.2d 547.

E. The Opportunity to Comment

Lastly, Sierra and Hartz argue that they were not afforded an effective opportunity to comment and neither the public nor they will be able to comment on later submissions made by Mills in conjunction with it fulfilling the conditions imposed by the NJDEP. We agree that the failure to build a role for public comment into the NJDEP process of reviewing the future Mills' submissions for compliance with the permits granted effectively bars public comment on matters of significant public interest. Consequently, we find that on this point, the matter should be remanded to the NJDEP to require it to fashion a system for public access and comment on those future Mills' submissions required by the special permit conditions.

IV. CONCLUSION

Accordingly, we affirm in all respects, except to remand the matter to the NJDEP to establish a method to permit public comment on future Mills' submissions.
NOTES
[1] In May 2008, subsequent to oral arguments in this case, Mills submitted to this court a decision of the United States Court of Appeals for the Third Circuit, Sierra Club v. United States Army Corps of Engineers, No. 06-4887, 277 Fed.Appx. 170, 2008 WL 2048359 (3d Cir. May 14, 2008), to which Hartz submitted a response letter. The Third Circuit found that "[b]ecause all but 0.12 acres of the 7.69 acres of wetlands have been filled and construction on top of the former wetlands is substantially complete, we can no longer provide Plaintiffs with any meaningful relief. Accordingly, we vacate the district court's opinion and remand with instructions to dismiss the action as moot." We note that under Third Circuit Internal Operating Procedure Rule 5.7, the Third Circuit does not regard such opinions as precedents which bind the court. We do not consider the decision as dispositive regarding the issues before us. The Third Circuit dismissal as "prudentially moot" does not bar us from our review. While we recognize the project has been substantially developed, the issues before us are of substantial importance, likely to reoccur, and capable of evading review. Therefore, we decline to dismiss the appeal as moot. Bankers Trust Co. of California, N.A. v. Delgado, 346 N.J.Super. 103, 106, 787 A.2d 195 (App.Div.2001) (citing Zirger v. General Acc. Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996)).
[2] An administrative agency may take account of fact finding made in complementary proceedings. See Wunschel v. City of Jersey City, 96 N.J. 651, 666, 477 A.2d 329 (1984).
[3] Mitigation is defined as a "replacement in kind within the same watershed." N.J.A.C. 7:7E-1.6. In contrast to the one-to-one acre replacement contemplated by the regulation, the Empire Tract and the Secaucus High School site constitute more than seventy-eight times the area of the filled land.