**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1950-24

CARLOS E. MENDEZ,

      Appellant,

v.

BOARD OF REVIEW,
DEPARTMENT OF LABOR,
and CREAM O LAND DAIRY,
INC.,

      Respondents.

_____

Argued May 5, 2026 – Decided May 15, 2026

Before Judges Rose and Torregrossa-O'Connor.

On appeal from the Board of Review, Division of Unemployment Insurance, Department of Labor and Workforce Development, Docket No. 330683.

Carlos E. Mendez, appellant, argued the cause on appellant's behalf.

Courtney Babb, Deputy Attorney General, argued the cause for respondent Board of Review (Jennifer Davenport, Attorney General, attorney; Christopher

Weber, Assistant Attorney General, of counsel; Gina M. Labrecque, Deputy Attorney General, on the brief).

PER CURIAM

Claimant Carlos E. Mendez appeals from a January 3, 2025 final decision of the Board of Review, disqualifying him from unemployment benefits under N.J.S.A. 43:21-5(a) because he left his job without good cause attributable to the work. We affirm.

I.

We summarize the pertinent facts and events from the record before the Board. From August 25, 2017 to February 28, 2023, Mendez was employed as a truck driver for Cream O Land Dairy, Inc. On February 26, 2023, Mendez filed a claim for unemployment benefits. On March 23, 2023, the Deputy Director of the Division of Unemployment Insurance disqualified Mendez from receiving unemployment benefits because he left his work voluntarily without good cause attributable to the work. On March 30, 2023, Mendez appealed the Deputy's decision to the Appeal Tribunal.

On January 31, 2024, the Tribunal conducted a telephonic hearing, during which Mendez was represented by counsel and testified on his own behalf, without the assistance of a Spanish-speaking interpreter. The employer presented the testimony of: human resources manager, Daviani Cordero;

operations manager, Emanuel Caravano; union representative, Jeremiah Rice; and vice president of operations, Scott Stoner.

Mendez testified Caravano terminated him on February 28, 2023 after Mendez questioned a large amount of tax deducted from his paycheck for vacation time. When Mendez requested Caravano correct the issue, Caravano "got mad," told Mendez he "ha[d] to resign," and attempted to have him sign a resignation letter. Mendez refused to sign the letter. That day, Mendez called Rice advising Caravano terminated him. Rice then contacted Stoner and arranged for Mendez to work on March 1, 2023.

After working his route on March 1, Mendez spoke with Rice in the parking lot and requested a personal day for March 2. When Mendez returned to work on March 3, 2023, he was unable to access the building and was told to speak with Caravano. Instead, Mendez contacted Rice. At the hearing, Mendez described a 2022 incident when he was terminated and later reinstated, which gave him hope he could keep his job this time.

Caravano testified, "Mendez asked to get paid out [for] his vacations because he needed the money." The employer complied. Thereafter, Mendez complained to Caravano that taxes were deducted from his paycheck. Explaining he "c[ould not] do anything about taxes that were taken out of [his]

check," Caravano told Mendez to speak with the payroll department. Mendez replied, "I'm giving you my two weeks' notice. I'm resigning and don't ask me to come back like you gave me my job back the last time." Caravano verbally accepted Mendez's resignation. Caravano testified, under the union contract, employees must resign via a formal writing or they are "not paid out anything that's owed to [them]." Although Mendez did not sign a resignation letter, he received all wages owed.

Rice testified Mendez asked for a vacation payout, which the company provided but included in Mendez' regular paycheck, placing him in a higher tax bracket. According to Rice, Mendez made "multiple attempts . . . before this incident transpired to get restitution," and Mendez said he would "resign from his position, but he didn't want to sign any type of resignation [letter] until he was aware if he was gonna get compensation." Rice stated Mendez believed if he continued working, he would face retaliation. Rice informed Mendez his "best course of action [wa]s to take the voluntary resignation."

Although Rice was not present when Mendez told Caravano he quit, Mendez acknowledged he spoke with Caravano "with an intent to resign from the company, but . . . wanted to make sure that he was going to receive full compensation." Rice testified he spoke with the union attorney who advised

A-1950-24

that Mendez "had the right[] to rescind his resignation."  When Rice asked Mendez if he would like to get his job back, Mendez responded, "No."  Rice stated Mendez "was adamant" because he feared retaliation.  Rice asserted he was not authorized to approve Mendez's off day and Mendez knew why he was taxed at a higher rate.

Text messages between Rice and Mendez were read into the record.  On an undisclosed date, Rice wrote:  "There is no policy.  They wrongfully terminated you.  Complaining isn't a violation."  At some point, Mendez replied:  "They told the unemployment that I resigned.  Why they said [sic] that if [Caravano] the boss fired me in front of everyone."  Rice replied, "Resigned gets you paid from them.  It didn't go to unemployment.  According to unemployment you were fired."

Rice explained he "was trying to create an impropriety against the company to show that [Mendez did]n't resign[], he was terminated."  That is why Rice told Mendez "to work and make it appear as if [he wasn't] resigning."  Rice asserted Mendez "knew what he did, he kn[e]w he resigned from th[e] position."  Mendez "didn't want to take the job back because" he feared "retaliation."  But after the union attorney informed them Mendez's refusal to return to work would be considered job abandonment, Rice and Mendez "went along with the

A-1950-24

resignation." Rice clarified he wanted to create the impression Mendez was terminated to ensure his compensation under the voluntary resignation provision of the union contract and so he qualified for unemployment benefits.

On redirect examination, Mendez denied he: told Rice he quit; did not want his job back; and participated in a scheme to create an impression he was terminated so he could collect unemployment benefits. Mendez maintained he was fired because he upset Caravano by questioning his withheld taxes.

On February 2, 2024, the Tribunal affirmed the Deputy's determination. The Tribunal credited Caravano's testimony that he "advised [Mendez] to seek the right tax resource" because Caravano "had no control over the tax deduction and therefore would have no cause to fire [Mendez] over it." Additionally, the Tribunal found Rice confirmed the text messages between Mendez and him were "part of a pretentious plot of a discharge for the receipt of unemployment benefits." Thus, the Tribunal concluded Mendez "resigned over the unresolved tax deduction and not for good cause," voluntarily left his work, and was disqualified for benefits.

Mendez administratively appealed the Tribunal's decision to the Board. In its January 3, 2025 final decision, the Board affirmed the Tribunal's determination, but supplemented the Tribunal's factfinding. The Board found

Rice's testimony "most persuasive and most credible as he testified that he was 'dragged into' the unemployment proceedings after colluding with [Mendez] to deceive the employer" so that Mendez could "receive the maximum compensation pursuant to the union contract" and "collect unemployment benefits." The Board also found Mendez resigned because he feared retaliation for inquiring about the reduction of his vacation pay and disagreed with the Tribunal's decision Mendez left "solely due to the unresolved tax deduction."

The Board determined Mendez did not leave employment "in a huff" as did the claimant in Savastano v. Board of Review, 99 N.J. Super. 397 (1968). The Board concluded Mendez "was given ample opportunity to rescind his resignation" and "was adamant in his decision to leave the employer." The Board concluded Mendez's return to work on March 1, was part of "a ploy to get paid according to the union contract and to receive unemployment benefits."

Self-represented on appeal, Mendez maintains he was terminated by Caravano and, as such, he did not voluntarily leave his employment. He further argues the Board's credibility findings are misplaced. For the first time on appeal, Mendez contends he should have been afforded the assistance of a Spanish interpreter at the hearing before the Tribunal.

A-1950-24

## II.

Well-established principles guide our review.  The scope of our review of an administrative agency's final determination is strictly limited.  Brady v. Bd. of Rev., 152 N.J. 197, 210 (1997); see also Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018).  An agency's decision may not be disturbed on appeal unless it is arbitrary, capricious, unreasonable, or inconsistent with applicable law.  Brady, 152 N.J. at 210.  "If the Board's factual findings are supported 'by sufficient credible evidence, courts are obliged to accept them.'"  Ibid. (quoting Self v. Bd. of Rev., 91 N.J. 453, 459 (1982)); see also McClain v. Bd. of Rev., 237 N.J. 445, 456 (2019).  "[I]n reviewing the factual findings made in an unemployment compensation proceeding, the test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs."  Brady, 152 N.J. at 210 (quoting Charatan v. Bd. of Rev., 200 N.J. Super. 74, 79 (App. Div. 1985)).

To avoid disqualification, a claimant has the burden of establishing he or she left work for "good cause attributable to work."  Brady, 152 N.J. at 218; see also N.J.S.A. 43:21-5(a) (providing an employee who "left work voluntarily without good cause attributable to such work" is disqualified from

unemployment-compensation benefits). "Good cause attributable to such work" is defined in N.J.A.C. 12:17-9.1(b) as "a reason related directly to the individual's employment, which was so compelling as to give the individual no choice but to leave the employment." An employee has left work "voluntarily" within the meaning of the statute "only if 'the decision whether to go or to stay lay at the time with the worker alone.'" Lord v. Bd. of Rev., 425 N.J. Super. 187, 191 (App. Div. 2012) (quoting Campbell Soup Co. v. Bd. of Rev., 13 N.J. 431, 435 (1953)). Accordingly, an employee who leaves a job without a sufficient work-related reason is disqualified from receiving benefits. See Self, 91 N.J. at 457; see also Cottman v. Bd. of Rev., 454 N.J. Super. 166, 169-70, (App. Div. 2018) ("With few exceptions, leaving work for personal reasons unrelated to the work, no matter how reasonable, disqualifies an employee from receiving unemployment benefits.").

In Savastano, cited by the Board in the present matter, the claimant argued with a coworker, left work early, returned the next day, and found out he was replaced. 99 N.J. Super. at 399. We noted:

> Employees frequently leave work temporarily for some fleeting physical or mental irritation, or "in a huff" occasioned by one or more of the frustrations attending commercial life, without intending to quit. Although such an individual may be said to have left work voluntarily and without good cause attributable to the

work, thus engaging in conduct which might justify a discharge by the employer, nevertheless such a party may not be said to have "left work" in the meaning of having severed his employment relationship with an intent not to return.

[Id. at 400.]

We held whether an employee quit or was fired "depends upon the facts of each particular case" and "is to be determined by the Board upon an analysis of the evidence and specific findings of fact supportive of its conclusion." Id. at 400-01. We remanded to the Board to determine "the critical questions[,]" including: "what, if anything, did [claimant] say when he left"; "was he prepared to resume work when he returned the following day"; "did the employer sever the employment relationship by the hiring of a permanent replacement"; and "did claimant quit or was he discharged?" Id. at 400.

In the present matter, the Board considered and rejected Mendez's argument that he left his employment "in a huff" as did the claimant in Savastano. The Board found Mendez was "adamant in his decision to leave the employer," and "sought union counsel after he resigned and chose not to rescind his resignation." Mendez's return to work on March 1 was not to resume his employment rather it was part of "a ploy to get paid according to the union contract and to receive unemployment benefits." We defer to the Board's

findings, <u>Brady</u>, 152 N.J. at 210, and conclude the record sufficiently demonstrated Mendez voluntarily resigned on February 28, 2023 because he was dissatisfied with the taxes withheld from his paycheck and feared retaliation for inquiring about his pay.

We also reject Mendez's contention that the Tribunal failed to "demonstrate[] a sufficient basis to find . . . Rice [more] competent or credible" than he. Based on its review of the record, the Board found Rice's testimony "most credible" because, as a union representative, he "did not testify in order to corroborate the testimony of the other employer witnesses[,] but to provide his firsthand account of his interactions and communications with [Mendez] despite potential adverse repercussions from the employer." We defer to the agency's credibility findings, <u>see</u> <u>Ardan v. Bd. of Rev.</u>, 444 N.J. Super. 576, 584 (App. Div. 2016), and there is sufficient evidence in the record that supports the Board's conclusion, <u>Brady</u>, 152 N.J. at 210.

For the first time on appeal, Mendez argues the Tribunal failed to provide a Spanish interpreter at the hearing. "Normally, we do not consider issues not raised below at an administrative hearing." <u>In re Stream Encroachment Permit</u>, 402 N.J. Super. 587, 602 (App. Div. 2008); <u>see also</u> <u>Nieder v. Royal Indem. Ins.</u>

<u>Co.</u>, 62 N.J. 229, 234 (1973); Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 3 on <u>R.</u> 2:6-2 (2026).

We have nonetheless considered Mendez's contentions and conclude they are belied by the record.  The transcript of the hearing reflects Mendez was represented by counsel, who advised the Tribunal Mendez's first language is Spanish, but Mendez "refused" an interpreter for testimonial purposes.  Based on our review of the transcript, we do not discern a language barrier or confusion.  Mendez fully answered questions, asked questions, offered testimony when no questions were pending, and never stated during the hearing he did not understand the proceedings.[1]

We therefore conclude the record supports the Board's conclusion Mendez left "voluntarily without good cause attributable to such work" under N.J.S.A. 43:21-5(a).  Because the  Board's decision "is supported by sufficient credible evidence on the record as a whole," <u>R.</u> 2:11-3(e)(1)(D), we discern no reason to disturb it.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

---

[1] We recognize Mendez requested, and was afforded, an interpreter during his self-represented argument before us.  However, that accommodation does not alter our conclusion Mendez understood and fully participated in the proceedings before the Tribunal for the reasons noted above.

A-1950-24